Varsha Tushar SHAH; Forum T. Shah;
Kunal T. Shah, Petitioners,

v.

IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.

No. 98–70845.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 11, 2000

Filed Aug. 15, 2000

1064

Garish Sarin, Los Angeles, California, for the petitioners.

Joan E. Smiley, Pauline Terrelonge, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before: PREGERSON, FERGUSON, and WARDLAW, Circuit Judges.

FERGUSON, Circuit Judge:

Varsha Tushar Shah and her two children, Kunal and Forum, natives of India, petition for review of the Board of Immigration Appeals' (BIA) decision dismissing their appeal from the denial of their applications for asylum and withholding of deportation. Both the BIA and the Immigration Judge (IJ) based their denial of the Shahs' application on an adverse credibility finding. We have jurisdiction pursuant to 8 U.S.C. § 1105a (1996).[1] We conclude that the adverse credibility determination rests on impermissible grounds. We deem the petitioners credible, and remand to the BIA.

## I. FACTUAL BACKGROUND

The following factual background is drawn from the Shahs' application for asylum, Mrs. Shah's testimony at the asylum hearing, and the corroborating evidence they submitted. Mrs. Shah testified that members of the mainly Muslim and ruling Congress Party (CP) murdered her husband, Tushar Vi Shah, and repeatedly threatened to kill the rest of the immediate family because of their active involvement in the predominantly Hindu Bharatiya Janata Party (BJP).

Mr. and Mrs. Shah became involved in the BJP in 1984. As members, they raised funds for the party and organized rallies.

Eventually, Mr. Shah became the BJP's paid employee and was very active in its campaign to win the 1991 election from the CP.

Members of the CP began to target the Shahs in July of 1991. In the time leading up to the 1991 election, Mr. Shah was repeatedly arrested, tortured, and ordered to stop working with the BJP. Although the CP threatened to kill Mr. Shah's family unless he left the BJP, he refused.

The CP's threats against the Shahs only got worse after the election. Its members attacked the family's home, leaving behind a threatening letter. When the Shahs reported the attack, the police refused to assist them. Ignored by the police, the Shahs turned to the BJP for protection. On July 7, 1991, a BJP leader responded in a letter to Mr. Shah's requests for help. In the letter, which the Shahs submitted as corroborating evidence, he reports to Mr. Shah that, "[w]e have asked the congress party to investigate this and are requesting special protection from police dept. or secret service." But he counsels the Shahs to go into hiding for two to three years until "there is safety to your life [sic] and that of your family." He adds, the "BJP is really proud of you and thank you for your support and dedication for the party. Since 1984 we have received your valuable time and you have dedicated your life for the spread of our party."

The mounting threats against the Shahs' lives persuaded Mr. Shah that escaping from India might be necessary. He and Mrs. Shah applied for visitors' visas from the United States Embassy, which they received in August of 1991. As Mrs. Shah testified, "he has thought up to obtain a visa and hold it in case of necessity I can— I can use it."

---

**1.** The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub.L. 104–208, 110 Stat. 3009 (Sept. 30, 1996), repealed this section. Because this case began before April 1, 1997, and the final order of deportation was issued after October 30, 1996, the transitional rules of IIRIRA apply. *See Duarte de Guinac v. INS*, 179 F.3d 1156, 1158 n. 2 (9th Cir.1999).

The CP murdered Mr. Shah on November 5, 1991. He had stopped his car at a red light when a truck suddenly smashed into the rear, killing him. The truck driver fled the scene in a getaway car. When Mrs. Shah asked the police for a report of the incident, they refused to give her one because of the family's affiliation with the BJP. In a letter to Mrs. Shah, dated November 21, 1991, which Mrs. Shah submitted as corroborating evidence, a BJP official wrote, "I think we all know who is behind this murder" and warned her that, "[y]ou and kids are the target of these killers and you have to go underground [sic]."

The threats and attacks against the family did not end with Mr. Shah's murder. The CP repeatedly harassed the children at school, until they were eventually forced to withdraw. Members of the CP appeared at the Shahs' house and threw stones. They called at all hours to threaten the family, warning Mrs. Shah that, "we have murdered your husband and we'll murder you and also children."

In fear of their lives, Mrs. Shah and her children abandoned their home in Ahmadabad. At first, they fled to a city called Surat in February of 1992, but they stayed only two months because the CP continued to threaten them. At the urging of the BJP, Mrs. Shah and her two children escaped from India altogether, and arrived in Los Angeles as visitors for pleasure on August 12, 1992.

Mrs. Shah testified that the CP will kill her and her children if they are forced to return to India. Tensions between Muslims and Hindus, frequently erupting into rioting and bloodshed, have escalated. People from home have warned Mrs. Shah against returning. In a letter Mrs. Shah submitted as evidence, dated December 12, 1994, a BJP leader warned her, "[y]our life or that of children is still in great danger if you decide to come back." He advised her, "[d]o not call your family members and give your address to anybody." She and her children applied for asylum on June 25, 1994. She explained in her asylum application that, "I being a widow of BJP worker will face the smae [sic] fate as that of my husband. Moreover I cannot go back to India as we all fear that we will be killed in India."

In addition to the letters from the BJP, Mrs. Shah introduced several affidavits into evidence to support her claim. The first affidavit, dated January of 1996, is written by a friend of Mr. Shah. It corroborates Mrs. Shah's testimony about the circumstances of her late husband's death stating that Mr. Shah died "due to rival political party had murdered him and managed to convert it into accidental death." The friend also describes in his affidavit how Mrs. Shah and her children moved repeatedly after Mr. Shah's death until it became too dangerous for them to remain in India. The second affidavit, written by a close relation of the Shahs, corroborates Mrs. Shah's claim that her late husband was a BJP employee and that his death was no accident. The affiant further writes that Mrs. Shah and her children "are not safe and it is not advisable for them to stay in India." In another affidavit, Mrs. Shah's brother describes how Mr. Shah was murdered for political reasons. He adds that, after the murder, "his family had a great shock and suffered their life in dangerous position and they had left their house within short period . . . ."

Mrs. Shah also introduced her late husband's death certificate into evidence. It lists the date of his death as November 5, 1991, which is consistent with Mrs. Shah's testimony, the letters from the BJP, and the affidavits of friends and relatives.

## II. IMMIGRATION PROCEEDINGS

The Shahs' asylum hearing was on March 18, 1996. That day, the IJ issued an oral decision denying the Shahs asylum and withholding of deportation on credibility grounds. He cited several reasons for deeming the Shahs not credible: (1) Mrs. Shah's corroborating evidence provided insufficient detail about the circumstances of Mr. Shah's death and why she feared re-

turning to India; (2) Mr. Shah's death certificate listed the date of his death as November 5, 1991, while a stamp on the same document contained a date of April 1, 1991; (3) Mrs. Shah failed to adequately explain why the death certificate did not list the cause of Mr. Shah's death and why she did not present another death certificate which would; (4) the fact that the couple's passports listed Mr. and Mrs. Shahs' occupations as accountant and housekeeper respectively and not as political workers; (5) insufficient evidence of her involvement in the BJP and of the harm she would suffer in India; and (6) an inconsistency between her claim that she would suffer persecution in India as a BJP member and assertions in a State Department country report on India stating that the "BJP's many electoral successes belie the assertion that it is not possible for a BJP member to live peaceably in India. Nor is it credible to allege that ... the Government systematically persecutes BJP members."

The BIA agreed with the IJ that the Shahs were not credible and it dismissed their appeal on this ground alone. It adopted only three of the six reasons the IJ used to deem them not credible: (1) its observation that the death certificate contained two separate dates; (2) the fact that Mr. Shah's passport identified him as an accountant, rather than a BJP employee; (3) and the State Department's suggestion that a BJP member who claimed that he could not live peaceably in India was not credible. The BIA then added four new bases for its adverse credibility holding: (1) Mrs. Shah's failure to explain why she did not provide the IJ with the records on which the death certificate was based; (2) her failure to authenticate letters from BJP leaders; (3) its belief that it "is unbelievable" that Mr. Shah could have worked for the BJP for more than ten years given the small number of letters the Shahs received; and (4) her failure to present more documentation given her claim that her husband was a BJP employee. Reasoning that its finding of adverse credibility "is dispositive for purposes of eligibili-

ty," the BIA did not determine whether the Shahs' evidence, if believed, could meet the asylum standard.

## III. DISCUSSION

### A. The BIA's Adverse Credibility Determination

We must uphold the BIA's denial of asylum if it is supported by reasonable, substantial evidence in the record. *INS v. Elias–Zacarias*, 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). The BIA's credibility findings are reviewed under the same substantial evidence standard. *See Garrovillas v. INS*, 156 F.3d 1010, 1013 (9th Cir.1998). Although this standard is deferential, "[t]he BIA must have 'a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief.'" *Id.* (quoting *Osorio v. INS*, 99 F.3d 928, 931 (9th Cir.1996)). The reasons also "must be substantial and bear a legitimate nexus to the finding" that the petitioner is not credible. *Osorio*, 99 F.3d at 931 (internal quotation marks omitted). Where, as here, "the BIA reviews the IJ's decision de novo, our review is limited to the BIA's decision, except to the extent that the IJ's opinion is expressly adopted." *Cordon–Garcia v. INS*, 204 F.3d 985, 990 (9th Cir.2000).

1. The Discrepancy Between the Death Certificate's Official Date Stamp and the Date Mrs. Shah Testified Mr. Shah Died.

The BIA based an adverse credibility finding on its observation "that the death certificate contains a date inconsistent with the date claimed by the adult female respondent as the date of her husband's death." Specifically, the BIA pointed to the fact that there are two different dates on the death certificate Mrs. Shah offered as corroborating evidence. Although it is true that the official stamp on the certificate is marked with the date of April 1, 1991, the date of Mr. Shah's death, which is listed as November 5, 1991, fully

comports with Mrs. Shah's testimony and the rest of her corroborating evidence. It is well-established that, "minor discrepancies in dates that are attributable to ... typographical errors" cannot properly serve as the basis for an adverse credibility finding. *Damaize–Job v. INS*, 787 F.2d 1332, 1337 (9th Cir.1986). There are any of number of reasons to account for the fact that the stamp on the death certificate pre-dates that listed as Mr. Shah's death. A clerk in the Indian bureaucracy may, for instance, have failed to change the date on the stamp. Alternatively, the certificate may have been pre-stamped in the month of April. Since the discrepancy is capable of being attributed to a typographical or clerical error, it cannot form the basis of an adverse credibility finding.

 In addition, we will not uphold an adverse credibility finding unless the IJ or BIA specifically explains the significance of the discrepancy or points to the petitioner's obvious evasiveness when asked about it. If discrepancies "cannot be viewed as attempts by the applicant to enhance his claims of persecution, [they] have no bearing on credibility." *Id.; see also Vilorio–Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir.1988) ("Minor inconsistencies in the record such as discrepancies in dates which reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding.") (citation omitted). In *Vilorio–Lopez*, we reversed the BIA's adverse credibility finding where it rested on several inconsistencies because "[w]ithout more specific direction and in the absence of obvious evasiveness, we are unable to say the IJ's adverse credibility finding is supported by substantial evidence." *Vilorio–Lopez*, 852 F.2d at 1142. Similarly, in *Damaize–Job*, 787 F.2d at 1337, we reversed an adverse credibility finding that rested on an inconsistency between the petitioner's application and his testimony relating to his children's birthdates because, "[t]he IJ nowhere explained how these inaccuracies reflected on the credibility of his persecution claims or for what possible reason Damaize would intentional-

ly have provided incorrect information on such trivial points."

We conclude that the discrepancy in Mr. Shah's death certificate is not a proper basis for an adverse credibility finding in this case. When the IJ asked Mrs. Shah about the two dates, she responded simply that she did not know why the stamp listed an earlier date than the date of her husband's death. Given that Mrs. Shah was not obviously evasive when she was asked to explain the discrepancy, we will not uphold an adverse credibility finding that rests on this basis "without 'specific direction' to any evasiveness in the record." *Vilorio–Lopez*, 852 F.2d at 1142. Like the IJ in *Damaize–Job*, moreover, the IJ gave no specific indication as to why the discrepancy is significant. In fact, neither the IJ nor the BIA explained why Mrs. Shah would lie about the date on which Mr. Shah was killed. We cannot affirm the credibility determination on this basis.

2. Mr. Shah's Occupation as a "Chartered Accountant" on His Passport.

 The BIA rested its adverse credibility finding on the observation that, "although the adult female respondent claimed that her husband was employed full-time for the BJP Party, her husband's passport indicated that he was a chartered accountant." We do not agree that there is an inconsistency here. Asked at the asylum hearing why the passport did not state that he worked for the BJP, Mrs. Shah responded, "[h]e used to work as a chartered accountant prior to 1984." That Mr. Shah was a chartered accountant in 1984, and listed as one in his passport, does not preclude his having been a BJP member and employee afterward. Moreover, Mrs. Shah testified that her husband raised funds for the BJP, which is wholly consistent with his having been an accountant. The BIA's determination that there was an inconsistency is unsupported by the record.

3. The BIA's Use of the State Department's Report to Find the Shahs Not Credible.

 The BIA relied on a statement in a State Department Report to deem the Shahs not credible. The State Department's report on India included the following sentence: "The BJP's many electoral successes belie the assertion that it is not possible for a BJP member to live peaceably in India." The BIA held that the Shahs' claim—that they faced persecution in India as BJP members—conflicted with this sentence in the State Department report. It deemed them not credible on this basis.

The BIA erred in basing its adverse credibility finding on the State Department's belief that BJP members will live in peace because of their party's recent electoral advances for several reasons. First, we have noted in a related context that, "[w]here an applicant has shown past persecution, evidence that individuals can live peacefully in some parts of applicant's home country has no bearing on the applicant's eligibility for asylum or withholding of deportation." *Singh v. Ilchert*, 69 F.3d 375, 380 (9th Cir.1995). Thus, we have "found the DOS [Department of State] opinion to be irrelevant in cases where individuals have experienced actual persecution by the government." *Id.* By the same token, it is not a "substantial, cogent reason" to discredit the petitioner's testimony of past persecution based on a report describing a general condition of peace in society.

Second, we have repeatedly held that it is error to rest a decision denying asylum on speculation and conjecture. *See Maini v. INS*, 212 F.3d 1167, 1175 (9th Cir.2000) ("[C]onjecture and speculation can never replace substantial evidence."); *Cordon–Garcia*, 204 F.3d at 993; *Lopez–Reyes v. INS*, 79 F.3d 908, 912 (9th Cir.1996). The State Department's assertion that, "[t]he BJP's many electoral successes belie the assertion that it is not possible for a BJP member to live peaceably in India" amounts to nothing more than that office's speculation about the effect the BJP's electoral gains will have on existing political persecution. We will not permit the BIA to use either its own or the State Department's conjecture to deem a person not credible. "Because conjecture is not a substitute for substantial evidence, we cannot uphold this finding." *Lopez–Reyes*, 79 F.3d at 912 (citation omitted).

 Moreover, by relying exclusively on a blanket statement in a State Department report, the BIA and the IJ failed to make the individualized analysis of an applicant's credibility that our case law mandates. It is well-established that "[t]he BIA must have 'a legitimate articulable basis to question the petitioner's credibility, and must offer a specific, cogent reason for any stated disbelief.'" *Garrovillas*, 156 F.3d at 1013 (quoting *Osorio*, 99 F.3d at 931). Indeed, "[g]eneralized statements that do not identify specific examples of evasiveness or contradiction in the petitioner's testimony prevent us from conducting a proper review." *Id.* As the Seventh Circuit recently recognized in *Galina v. INS*, 213 F.3d 955, 959 (7th Cir.2000), "the [State Department] reports are brief and general, and may fail to identify specific, perhaps local, dangers to particular, perhaps obscure, individuals." The rule requiring an individualized adverse credibility determination is, of course, not satisfied when the IJ or BIA rely on descriptions about the circumstances people like the applicant have faced, or will face, in their countries of origin.

Finally, it was improper for the BIA to rely on the State Department's opinion in finding the Shahs not credible "because it is the Attorney General, not the Secretary of State, whom Congress has entrusted with the authority to grant asylum and because 'there is perennial concern that the [State] Department soft-pedals human rights violations by countries that the United States wants to have good relations with.'" (*Gailius v. INS*, 147 F.3d 34, 46 (1st Cir.1998) (quoting *Gramatikov v. INS*,

128 F.3d 619, 620 (7th Cir.1997)) (alteration in original)); *see also Galina*, 213 F.3d at 958 ("The Board ought by this time to realize, moreover, that in the case of countries that are friendly to the United States, such as Latvia, the State Department's natural inclination is to look on the bright side."). In short, the BIA erred in relying on a factually unsupported assertion in a State Department report to deem the Shahs not credible.[2]

### 4. Mrs. Shah's Failure to Corroborate Her Husband's Death Certificate with the Underlying Documents.

The BIA impermissibly relied on Mrs. Shah's failure to introduce the records underlying her husband's death certificate to deem the petitioners not credible. It wrote, "if, as the adult female respondent claimed, the death certificate was an 'abstract of records,' she has not explained why she did not attempt to provide the records on which this certificate was based. The circumstances surrounding her husband's death were the most significant evidence the adult female respondent could provide. Yet the document in question sheds no light on the circumstances of his death."

Mrs. Shah's failure to present more documentation relating to her husband's death, or to explain why she did not, was an impermissible basis for an adverse credibility determination for several reasons. First, "corroborative evidence is not necessary for a petitioner to establish past persecution." *Garrovillas*, 156 F.3d at 1016. Similarly, "we do not require that an alien produce independent evidence of a specific threat to his life." *Mejia–Paiz v. INS*, 111 F.3d 720, 722 n. 1 (9th Cir.1997). This is because, "an authentic refugee is often limited in his ability to offer direct corroboration of specific incidents of persecution." *Id.; see also*

*Lopez–Reyes*, 79 F.3d at 912 ("Requiring an applicant to present corroborating evidence would make it close to impossible for any political refugee to make out a . . . case for asylum.") (internal quotation marks omitted) (alteration in original) (brackets omitted); *Aguilera–Cota v. INS*, 914 F.2d 1375, 1380 (9th Cir.1990) ("[R]efugees sometimes are in no position to gather documentary evidence establishing specific or individual persecution or a threat of persecution.") (internal quotation marks omitted). The record indicates that Mrs. Shah fled India because of repeated threats to her and her children's lives. The record does not indicate whether it would have been possible for her to obtain more documentation relating to her husband's death. As explained above, the BIA's adverse credibility finding must be supported by substantial evidence. *See Garrovillas*, 156 F.3d at 1013. In the absence of substantial evidence showing that such documentation was "easily available," we hold that the BIA impermissibly based an adverse credibility finding on Mrs. Shah's failure to come forward with more corroborating evidence. *Sidhu v. INS*, 220 F.3d 1085 (9th Cir.2000).

Moreover, as we recognized in *Akinmade v. INS*, 196 F.3d 951, 956 (9th Cir.1999) (internal quotation marks omitted), the fact that an applicant's evidence "is not as complete as might be desired cannot, without more, properly serve as a basis for a finding of lack of credibility." Here, Mrs. Shah submitted evidence relating to her husband's death. That it did not contain as much information as the IJ and BIA would have preferred cannot, standing alone, form the basis of an adverse credibility finding. In sum, the BIA erred in finding that the Shahs were not credible based on their failure to offer the

---

**2.** We recognize that in *Duarte de Guinac*, 179 F.3d at 1162 (emphasis added), we stated that "the purpose of country conditions evidence . . . is to provide information about the *context* in which the alleged persecution took place, in order that the factfinder may *intelli-*

*gently* evaluate the petitioner's credibility." The State Department's country report in this case does not contain any facts which provide a "specific, cogent reason" for disbelieving the petitioners. *Garrovillas*, 156 F.3d at 1013.

documents underlying Mr. Shah's death certificate.

### 5. Mrs. Shah's Failure to Authenticate the Letters She Submitted.

 The BIA impermissibly grounded its adverse credibility finding on its observation that "none of these letters [the Shahs submitted] has been authenticated. There is no indication that the letters were actually written by BJP members, or whether they are forged. We note, moreover, that the documents appear to have been manufactured specifically to support an asylum claim."

 The BIA's suggestion that the letters the Shahs submitted as evidence are unreliable or forgeries is an impermissible basis for deeming them not credible. There is no evidence in the record to indicate that the letters are anything but what a BJP member would receive from the party's leadership. There is certainly no evidence in the record to support the BIA's apparent belief that the letters are unreliable or forged. The BIA's belief to the contrary amounts to nothing more than its subjective view of what a letter from a BJP leader to a BJP member would look like. We cannot uphold an adverse credibility finding that rests on conjecture and speculation. *Lopez–Reyes*, 79 F.3d at 912.

### 6. The Fact that Mrs. Shah Only Had the Letters She Submitted As Evidence In Her Possession.

 It was improper for the BIA to conclude that the Shahs were not credible because "[i]t is unbelievable that the adult female respondent's husband would have worked for the BJP for more than 10 years before his death, yet these were the only pieces of correspondence received by the respondents." Speculation and conjecture cannot form the basis of an adverse credibility finding, which must instead be based on substantial evidence. *See, e.g., Akinmade*, 196 F.3d at 957; *Lopez–Reyes*, 79 F.3d at 912. In *Lopez–Reyes*, we reversed the IJ's adverse credibility finding

because it rested on conjecture. The IJ in that case "found it 'astonishing' that 'after being chased by guerillas, shot at by guerillas, and beaten by the same guerillas,' Lopez was not then killed." *Lopez–Reyes*, 79 F.3d at 912. We recognized that this assertion rested on "personal conjecture about what guerrillas likely would and would not do" and thus concluded that it was an impermissible basis for an adverse credibility finding. *Id.*

The BIA's adverse credibility finding in this case similarly rests on conjecture and speculation, and we therefore cannot uphold it. Nowhere in the BIA's opinion does it cite to evidence indicating how many letters a member ought to receive from the BJP. In fact, the assertion that Mrs. Shah did not have a sufficient number is based on the BIA's conjecture about how many letters the BJP would send a decade-long member like Mr. Shah. We will not uphold an adverse credibility finding that rests on a speculative ground.

### 7. Mrs. Shah's Failure to Present Other Documentation to Support Her Claim.

 Finally, the BIA's assertion that Mrs. Shah "should have been able to present other documentation to support her claims" since her husband was a member for ten years is an impermissible ground for an adverse credibility finding. First, it is based on speculation and conjecture that people who have been BJP members for as long as Mr. Shah would have the documentation to prove it. As we explain above, conjecture and speculation cannot serve as a reason for an adverse credibility finding. *Akinmade*, 196 F.3d at 957. Second, as we also describe above, we do not require petitioners like Mrs. Shah and her children, who flee their persecutors and seek refuge in this country, to provide more evidence to buttress their claims since "[a]uthentic refugees rarely are able to offer direct corroboration of specific threats or specific incidents of persecution." *Turcios v. INS*, 821 F.2d 1396, 1402 (9th Cir.1987) (citations omitted). There is no evidence, let alone substantial evidence,

in the record that would indicate that any such evidence was available to Mrs. Shah.

In sum, we reverse the BIA's adverse credibility determination because it rests on impermissible grounds. Contrary to the BIA's determination, Mrs. Shah's testimony was not only internally consistent, but also comported with her asylum application and the documents she submitted as corroboration. We instead deem Mrs. Shah's testimony credible, as we have done in similar cases. *See, e.g., Akinmade,* 196 F.3d at 958; *Aguilera–Cota,* 914 F.2d at 1383.

**B. The Shahs Suffered Persecution on Account of a Political Opinion**

■■■ Having concluded that the petitioners are credible, we are compelled to find that they suffered past persecution on account of a protected ground. *Elias–Zacarias,* 502 U.S. at 481, 112 S.Ct. 812; *Navas v. INS,* 217 F.3d 646, 2000 WL 780997, * 9 (9th Cir. June 20, 2000) ("In general, we do not remand a matter to the BIA if, on the record before us, it is clear that we would be compelled to reverse its decision if it had decided the matter against the applicant."). "The determination that actions rise to the level of persecution is very fact-dependent, though threats of violence and death are enough." *Cordon–Garcia v. INS,* 204 F.3d at 991 (citation omitted). Mrs. Shah testified that CP members killed her husband and repeatedly threatened her and her family, all because they were affiliated with the BJP. We have found petitioners eligible for asylum in similar cases, and we do so again here. *See, e.g., Akinmade,* 196 F.3d at 958; *Reyes–Guerrero v. INS,* 192 F.3d 1241, 1245–46 (9th Cir.1999) (holding that threats against the petitioner because of perception that he caused damage to political cause amounted to past persecution on account of a political opinion); *Briones v. INS,* 175 F.3d 727, 728 (9th Cir.1999) (en banc) (concluding that petitioner suffered persecution on account of a political opinion where he was placed on an assassination list and sent a death threat); *Vera–Valera v. INS,* 147 F.3d 1036, 1039 (9th Cir.1998) (holding that death threats from guerrillas in Peru constituted persecution on account of a protected ground).

**C. Well–Founded Fear of Persecution**

■■■ Although the Shahs are entitled to a rebuttable presumption of a well-founded fear of future persecution because they have shown past persecution, *see* 8 C.F.R. § 208.13(b)(1)(i); *Singh v. INS,* 94 F.3d 1353, 1360–61 (9th Cir.1996), we conclude that the Shahs have directly proven by compelling evidence that they have a well-founded fear of persecution. *Navas,* 217 F.3d 646, 2000 WL 780997, *9. The murder of Mr. Shah, and repeated threats against the rest of the family both before and afterward, are sufficient to establish that their fear is well-founded. *See Gonzalez v. INS,* 82 F.3d 903, 909–10 (9th Cir.1996) ("The violence actually committed against other members of Mrs. Gallegos's family, and repetition of threats to her, made her fear of violence well founded."); *Hernandez–Ortiz v. INS,* 777 F.2d 509, 515 (9th Cir.1985) (concluding that petitioner's fear was well founded where persecutors committed violence against family members).

**D. Withholding of Deportation**

■■■ We must withhold the Shahs' deportation if they have established a "clear probability of persecution." *Duarte de Guinac,* 179 F.3d at 1164. They are entitled to a rebuttable presumption of entitlement to withholding of deportation if they show past persecution which threatened their lives or freedom. *Id.; see also Surita v. INS,* 95 F.3d 814, 821 (9th Cir. 1996). "To rebut this presumption, the INS must show by a preponderance of the evidence that the conditions in India have changed to such an extent that it is no longer more likely than not that they would face persecution there." *Maini,* 212 F.3d at 1178. The IJ entered into evidence only three pages of the State Department's country conditions report. Under the heading "Muslim–Hindu communal strife," the pages describe a massacre in the early 1990s and some of the electoral

changes in India. They do not, however, give us any indication about whether the Shahs will likely face persecution should we force them to return to India. "Where, as here, we conclude that past persecution has been established, but. the INS has failed to introduce the requisite country conditions information and thus has failed to meet its evidentiary burden on that issue, we do not remand, because the ultimate outcome is clear." *Navas v. INS,* 217 F.3d 646, 2000 WL 780997, *10 (9th Cir.2000); *see also Ladha v. INS,* 2000 WL 867980, *10 (9th Cir. June 30, 2000) (considering whether the evidence currently in the record compels a finding that a presumption of eligibility for asylum has not been rebutted). Neither these pages, nor any other evidence in the record, is sufficient to rebut the presumption and we therefore conclude that the Shahs are entitled to withholding of deportation.

Petition for review GRANTED; REMANDED for the Attorney General to exercise her discretion with respect to the asylum claim, and for the grant of withholding of deportation.