NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 06a0735n.06
Filed: October 5, 2006

No. 05-4266

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| **GHATTAS NAGUIB ABDALLA,** | ) | |
| | ) | ON REVIEW FROM THE |
| *Petitioner*, | ) | BOARD OF IMMIGRATION |
| | ) | APPEALS |
| v. | ) | |
| | ) | **O P I N I O N** |
| **ALBERTO GONZALES**, Attorney General, | ) | |
| | | |
| *Respondent*. | | |

**BEFORE:** NORRIS, COLE, and COOK, Circuit Judges.

**R. GUY COLE, JR., Circuit Judge**. Petitioner Ghattas Naguib Abdalla petitions this Court

for review of an order of the Board of Immigration Appeals ("BIA") affirming an immigration

judge's ("IJ") denial of Abdalla's application for asylum under Section 208 of the Immigration and

Nationality Act ("INA"), codified at 8 U.S.C. § 1158, his application for withholding of removal

under Section 241(b)(3) of the INA, codified at 8 U.S.C. § 1231(b)(3), and his request for

withholding of removal under the United Nations Convention Against Torture ("CAT"), 8 C.F.R.

§ 208.16. Abdalla argues that the BIA erred in adopting the IJ's findings that Abdalla did not

establish either past persecution or a well-founded fear of, or probable, future persecution. For the

following reasons, we **AFFIRM** the decision of the BIA and **DENY** the petition for review.

## I. BACKGROUND

Abdalla is a native and citizen of Egypt who identifies himself as a member of the Coptic Orthodox Church, a sect of Christianity. Abdalla entered the United States on May 9, 2000 on a non-immigrant tourist visa with authorization to remain in the United States until November 9, 2000. On August 6, 2001, Abdalla filed an application for asylum under Section 208(a) of the INA, withholding of removal under Section 241(b)(3) of the INA, and relief under the CAT. Abdalla's application was accompanied by a notarized affidavit signed by Abdalla describing the bases of his requests for relief. On October 26, 2001, the Immigration and Naturalization Services ("INS") (now the Department of Homeland Security) instituted removal proceedings against Abdalla and served him with a "Notice to Appear" in the immigration court on July 10, 2002. Abdalla was charged with being removable under Section 237(a)(1)(B) of the INA, codified at 8 U.S.C. § 1227(a)(1)(B), for overstaying his visa. On July 5, 2002, Abdalla submitted a second application for asylum with an amended affidavit. A removal hearing was held on October 22, 2002. The immigration court found Abdalla removable and designated Egypt as the country for removal.

On June 9, 2004, an IJ conducted a hearing on Abdalla's asylum application. At the hearing, and with counsel present, Abdalla testified through an interpreter. Abdalla testified that after fleeing to the United States, he planned to return to Egypt. His plans to return changed after receiving a letter from his wife warning of a nationwide arrest warrant against him. Abdalla testified that his wife's letter describes that police had attacked, beaten, and raped her to learn of Abdalla's whereabouts. Abdalla was unable to produce an original version of his wife's letter. There were two

versions of the translation of the letter admitted into evidence. One version states that the police attack occurred on June 3, 2001 and the other version states that it occurred on May 29, 2001.

The IJ made three findings regarding Abdalla's asylum application. First, the IJ noted that Abdalla remained in the United States for several months after his visa expired in November 2000 but before he allegedly learned of the outstanding warrant in May or June of 2001. Second, the IJ did not find credible Abdalla's assertions regarding his discovery of a nationwide warrant against him, noting that neither version of the letter from his wife mentions a warrant. The IJ also noted that in the letter Abdalla's wife stated she was forced from their home and was now living with her parents, but this is inconsistent with Abdalla's testimony that she had already been living with her parents after the family's home was destroyed in a prior attack on July 9, 1999.

Ultimately, the IJ denied Abdalla's application for asylum, finding that the petition was untimely because Abdalla failed to file his petition within one year of entry into the United States. Further, the IJ concluded that Abdalla's untimely filing was not excused by extraordinary circumstances or changed country conditions.

The IJ further concluded that Abdalla was not entitled to withholding of removal or protection under the CAT because Abdalla had not presented a credible claim. The IJ found that Abdalla had "submitted documents which appear to be altered, that contain contradictory and suspect dates, and . . . documents which appear, on their face, to be fraudulent." (JA 082.)

The IJ's ruling centered on his determination that Abdalla's testimony regarding his fear of persecution was not credible. First, the IJ concluded that Abdalla had not met his burden of demonstrating that he was a Coptic Christian, because none of the evidence Abdalla offered on this

issue was credible. Although Abdalla's marriage certificate stated his religion was Coptic, the IJ found the document suspicious because the marriage date did not match the date offered by Abdalla in his testimony. Abdalla offered into evidence a marriage certificate stating that his wedding took place on February 15, 1990, but Abdalla testified that he was married on January 25, 1990.[1]

The IJ also considered a letter from Father Faraj Abdul Maseeh Saleh, stating that Abdalla was a member of his church and that he was forced to leave Egypt due to difficulties caused by "the Islamic Group." (JA 251.) The record includes another letter, signed "Rev. Hanna," stating that Abdalla was "one of the church's faithfull servant [sic]," and that because of this, "he faced many problems, and these problems made leave [sic] the country and travel to the states." (JA 254.) In determining whether these documents satisfied Abdalla's burden of showing he is a Coptic Christian, the IJ attached no weight to these documents because they were not original copies and no testimony was offered that could lend any weight to the documents.

The IJ also found that Abdalla lacked credibility in his accounts of alleged persecution. Abdalla testified that on June 6, 1999, a group of six or seven Muslims attacked his home. Abdalla claimed that the mob barged into his home, ransacked his property, beat him and his family and two guests with sticks and fists, and threw objects at them. Abdalla's testimony added that they had been listening to a tape recording of a mass at the time of the attack and that the attackers commented on their sinfulness in listening to a mass. According to Abdalla's testimony, one of the attackers picked up his child and threw him against a wall, a fact not contained in Abdalla's asylum application.

---

[1]In an attempt to reconcile the different dates, Abdalla testified that he was married on January 25 in a church but had the marriage certificate notarized on a different date.

Abdalla claimed that his wife and child sought medical attention after the attack. Abdalla's application also states that Abdalla's wife suffered a broken arm and bruises over her entire body, and that Abdalla's children suffered bruises and cuts over their entire bodies. Abdalla and the two guests reported the incident to the police, but the police refused to write a report and instead recommended that Abdalla and his friends avoid future problems by converting to Islam.

In concluding that Abdalla's testimony lacked credibility, the IJ emphasized the discrepancy in the date Abdalla's first alleged attack occurred, noting that the medical report lists June 7, and not June 6, as the "Date Injured." Abdalla testified that the attack occurred on June 6 and his visit to the doctor occurred on June 7. When this discrepancy was pointed out to Abdalla, he testified that the "Date Injured" on the medical report reflects the date he went to the hospital and "Medical Committee Date" was the date his doctor prepared the report. The IJ chose not to credit Abdalla's explanation that he was attacked on the 6th, visited the hospital on the 7th, and the report was prepared on the 8th, because "the injury occurred is very clearly stated as June 7th." (JA 079.) The IJ also noted that the available translation of the document described a wrist fracture, which was inconsistent with Abdalla's testimony that he had suffered a broken thumb and little finger in the attack. Abdalla claimed that the English translation, stating he had a wrist fracture, was an incorrect translation.

Abdalla also offered into evidence a second medical report, which stated that he had a cut on his thumb requiring stitches and had sustained blows to his right shoulder and back. The IJ emphasized that the second medical report appeared, from the copy available, to have been altered to change the date from June 15, 1997 to June 15, 1999, and noted that Abdalla had not provided an

original version of the document to consult. The IJ also stressed that the second medical report described a cut on the left thumb, a contusion on the right index finger, hematomas, and loss of consciousness, all of which was inconsistent both with Abdalla's testimony of a broken thumb and finger and with the first medical report's description of a wrist fracture.[2]

Abdalla testified that on July 8, 1999, another group of about seven or eight people attacked him and his family at their home. Abdalla claimed that the mob raped his wife, who was visibly pregnant, and burned down the family's home. According to Abdalla's testimony, the attackers told him and his family to convert to Islam or they would kill them. In his application for asylum, Abdalla stated that his family again sought medical treatment after the attack, but in his testimony Abdalla stated that his wife did not seek medical attention after being raped, despite being pregnant.

The IJ also found that Abdalla's testimony and application contained inconsistencies regarding the July 8th attack. The IJ cited as an example the second rape of Abdalla's wife, which Abdalla allegedly learned about through his wife's letter but is absent from his initial application for asylum. As another example, the IJ noted that Abdalla's application described his wife as seeking medical attention after being raped, but that in his testimony Abdalla stated she did not seek medical treatment.

Abdalla testified that after the second attack he again went to police to file a report. This time, according to Abdalla, officers beat him and left him in a small room with no toilet and a foul

---

[2]Abdalla testified that he had broken bones in one of his fingers and bruises. The first medical report indicated that he had a wrist fracture. Abdalla claimed that the English translation, stating he had a wrist fracture, was incorrect.

smell. Abdalla testified that he was held for nine days, during which time he was tortured daily and given only a piece of bread and cup of water each day.

Abdalla testified that Egyptians were required by law to carry identification cards indicating their religion and that the officers who were torturing him forced him to sign an identification card stating that he was Muslim. However, when asked where the card was, Abdalla said the officers took it from him. When asked why the officers would take it from him if he was required to carry it with him, Abdalla stated that they were waiting to see whether he had really converted and then would have given the card to him after they were assured of his conversion.

In his asylum application, Abdalla stated that he was forced to sign a document stating he "would convert." At the beginning of Abdalla's hearing, his counsel requested the affidavit be changed to read "I did convert" instead of "I would convert," and Abdalla's testimony indicated that the identification card he was forced to sign indicated that he did, in fact, convert. During cross-examination, the Government placed great significance on the change from "would convert" to "did convert," but Abdalla stated that it was a mistake in translation.

The IJ also found that Abdalla's account of his forced conversion lacked credibility. The IJ stressed that in Abdalla's original asylum application he described signing a statement that he "would convert," but he testified in his hearing that he did convert. The IJ also found that Abdalla's justification for no longer having the identification card documenting his conversion (that "the police kept it until they were sure his conversion was legitimate") was "so implausible as to be ludicrous." (JA 082.)

The IJ concluded that Abdalla's application was fraudulent and denied Abdalla all forms of requested relief. Abdalla filed a timely appeal to the BIA. The BIA affirmed the IJ's adverse-credibility finding, his conclusion that Abdalla's asylum application was untimely, and his decision that Abdalla had not met his burden of proof for withholding of removal or protection under the CAT.

Abdalla filed a timely petition for review with this Court.

## II. DISCUSSION

### A. Application for Asylum: Timeliness and Jurisdiction

Section 208(a)(2) of the INA, 8 U.S.C. § 1158(a)(2)(B), requires that an alien seeking asylum file his application within one year of entry into the United States. An untimely application may be considered only if the applicant can demonstrate by clear and convincing evidence that there are changed-country circumstances materially affecting his eligibility for asylum or extraordinary circumstances that justify his delay in filing. 8 U.S.C. § 1158(a)(2)(D).

The BIA adopted the IJ's conclusion that Abdalla's asylum application was untimely and that Abdalla failed to demonstrate a changed circumstance justifying his delay in filing. This Court does not have jurisdiction to review a decision by the BIA that an asylum application is untimely, nor to review any factual determination regarding the applicability of the Section 1158(a)(2)(D) exceptions for late filing. *See Castellano-Chacon v. INS*, 341 F.3d 533, 533 (6th Cir. 2003) ("[W]e are barred from reviewing the BIA's decision denying [Petitioner's] application on the basis that it was untimely" because the INA states that "'[n]o court shall have jurisdiction to review any determination of the Attorney General under paragraph (2).'" (quoting 8 U.S.C. § 1158(a)(3)));

*Almuhtaseb v. Gonzales*, 453 F.3d 743, 748 (6th Cir. 2006) (We "do not have jurisdiction to review [Petitioner's] appeal of the denial of asylum because her claim before the BIA and this court is based on her assertion that the IJ incorrectly applied the 'changed circumstances' provision.").

Abdalla's application for asylum was denied because he filed it more than one year after his entry into the United States, and because the BIA made the factual determination that his late filing should not be excused. Therefore, we are without jurisdiction to review the denial of Abdalla's asylum application as untimely.

### B. Withholding of Removal and CAT: Abdalla's Credibility

This Court has jurisdiction over Abdalla's appeal of the BIA's denial of his requests for withholding of removal and relief under CAT. *See* 8 U.S.C. § 1252(b)(4); *Castellano-Chacon*, 341 F.3d at 545-53 (reviewing withholding of removal and CAT requests despite lack of jurisdiction to review timeliness of asylum application). The BIA adopted the IJ's findings regarding Abdalla's eligibility for withholding of removal and CAT relief. Where the BIA adopts the IJ's reasoning, this Court reviews the IJ's decision directly to determine whether the BIA's decision should be upheld. *Denko v. INS*, 351 F.3d 717, 723 (6th Cir. 2003).[3]

An alien seeking withholding of removal must demonstrate "that there is a clear probability that he will be subject to persecution if forced to return to the country of removal." *Singh v.*

---

[3] Although Abdalla has been deported, we retain Article III jurisdiction. *See Santana-Albarran v. Ashcroft*, 393 F.3d 699, 701 n.1 (6th Cir. 2005) ("removal of an alien . . . does not moot a pending appeal"). Abdalla continues to suffer an ongoing injury from the order of removal after his deportation because he would be prevented from seeking re-entry for five years after his removal. *See* 8 U.S.C. 1182(a)(9)(A)(i); *Chong v. District Director, INS*, 264 F.3d 378, 385 (3d Cir. 2001); *Max-George v. Reno*, 205 F.3d 194, 196 (5th Cir. 2000).

*Ashcroft*, 398 F.3d 396, 401 (6th Cir. 2005) (quoting *Pilicia v. Ashcroft*, 388 F.3d 941, 951 (6th Cir. 2004)). *See also* 8 U.S.C. § 1231(b)(3)(A) (requiring an alien to show that he would be subject to persecution upon return to his country on account of his "race, religion, nationality, membership in a particular social group, or political opinion"). To be eligible for CAT relief, an alien must show that it is "more likely than not that he . . . would be tortured if removed to the proposed country of removal." 8 C.F.R. § 208.16(c)(2).

The IJ's determination must be upheld unless "manifestly contrary to the law," and any administrative findings of fact "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4). In order to reverse a factual determination, this Court must find that "the evidence not only supports a contrary conclusion, but indeed *compels* it." *Klawitter v. INS*, 970 F.2d 149, 151-52 (6th Cir. 1992).

Credibility determinations are considered findings of fact and are thus subject to the deferential standard of review set forth in Section 1252(b)(4). *Yu v. Ashcroft*, 364 F.3d 700, 702 (6th Cir. 2004). Although an adverse credibility finding is afforded substantial deference, the finding must be supported by specific reasons, and "must be based on issues that go to the heart of the applicant's claim," as opposed to irrelevant inconsistencies. *Sylla v. INS*, 388 F.3d 924, 925-26 (6th Cir. 2004). "If discrepancies 'cannot be viewed as attempts by the applicant to enhance his claims of persecution, they have no bearing on credibility.'" *Daneshvar v. Ashcroft*, 355 F.3d 615, 623 (6th Cir. 2004) (quoting *Shah v. INS*, 220 F.3d 1062, 1068 (9th Cir. 2000)).

Although Abdalla argues that the IJ "latches on to . . . minor semantic issues such as the difference between use of the word 'would' and 'did,'" the record reveals that the IJ fulfilled her

responsibility of providing specific reasons for her adverse credibility findings and of basing her findings on issues going to the heart of Abdalla's application.

Some of the IJ's findings regarding a lack of credibility clearly go to the heart of Abdalla's application. These include Abdalla's failure to provide any original documents, his implausible explanation for why he did not have the identification card documenting his forced conversion, inconsistent accounts of his alleged injuries, his omission of his wife's second rape in his original asylum application, inconsistent accounts of when his home was destroyed and when his wife moved in with her parents, the lack of evidentiary support for his assertion that he had learned of a nationwide warrant for his arrest in Egypt, and an inconsistent explanation for remaining in the United States after his visa expired but before he learned of the warrant.

On the other hand, some of the discrepancies highlighted by the IJ are irrelevant inconsistencies that could not be viewed as attempts to enhance Abdalla's persecution claims. The discrepancy in Abdalla's wedding date, for instance, does not go to the heart of whether Abdalla was a practicing Christian or whether he faced persecution as a Christian. Likewise, the discrepancy between June 6 and June 7 as the date of Abdalla's first attack seems like a trivial inconsistency, particularly given that the events transpired several years prior to Abdalla's application and hearing. Similarly, the discrepancies in wording between Abdalla stating that he "would convert" and "did convert" are easily explained by translation error or even grammatical mistake in the original. In sum, however, the evidence does not compel a finding that the IJ's adverse-credibility determination was in error.

Abdalla further argues that while the omission of key events coupled with inconsistencies "can" support an adverse-credibility finding, no precedent holds that such factors "must" result in an adverse-credibility finding. Abdalla therefore argues that "the judge chose to find [Abdalla] not credible when she did not have to make that finding." (Pet. Br. at 12.) Abdalla's argument misunderstands this Court's scope of review. Even if the available evidence did not compel a finding by the IJ that Abdalla lacked credibility, the IJ's finding must be upheld unless this Court is compelled to find to the contrary. 8 U.S.C. § 1252(b)(4)(B); *see also INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992) (noting it is "beside the point" that a record may be "adequate to support" a different conclusion); *Klawitter*, 970 F.2d at 151-52 (holding that evidence must not only support a contrary conclusion, but compel it).

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the decision of the BIA and **DENY** Abdalla's petition for review.