Rakesh MAINI;  Jasmail Maini;
Vikram Maini;  Arjum Maini,
Petitioners,

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,**
Respondent.

No. 98–70894.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 11, 2000

Filed May 19, 2000

Garish Sarin, Los Angeles, California, for the petitioners.

John G. Cunningham, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before: PREGERSON, FERGUSON, and WARDLAW, Circuit Judges.

FERGUSON, Circuit Judge:

Rakesh Maini, his wife Jasmail Maini, and their sons Vikram and Arjum, petition for review of the Board of Immigration Appeals' (BIA) decision dismissing their appeal from the denial of their applications for asylum and withholding of deportation. They claim that, beginning in 1984 until their flight from India in 1992 (when Vikram Maini fled) and 1993 (when the rest of the petitioners fled), the Communist Party Marxist (CPM) persecuted them because they are an interreligious family. Although the Immigration Judge found the Mainis credible, both he and the BIA denied them asylum, reasoning that the CPM could not have objected to the Mainis' intermarriage because it is made up of people who practice different religions. We deem this reasoning to be speculative and inconsistent with the record evidence. We conclude that the record compels a finding that the Mainis have suffered persecution on account of religion and we grant and remand the petition for review.

## FACTUAL BACKGROUND

At their asylum hearing on April 24, 1996, Mr. Maini, Mrs. Maini, and Vikram testified that they fled their home in Calcutta, India, in 1992 and 1993 after enduring years of threats, harassment, and—in Vikram's case—physical beatings at the hands of CPM members. Mr. Maini, a Hindu, and Mrs. Maini, a Sikh, were married on May 20, 1976, in an interfaith ceremony. They moved from Punjab to Calcutta, in West Bengal, where they had two sons, Vikram and Arjum, and a daughter. Vikram, the only one of their children present at the immigration hearing, testified that he followed both religions.

For a while, the Mainis lived very comfortably in Calcutta. Mr. Maini worked as the General Manager of an engineering company. The family enjoyed an affluent

lifestyle; they lived in a house, employed two domestic workers, and rode in a chauffeur-driven car.

But in 1984, the Mainis' standard of living took a steady turn for the worse. On October 31, 1984, Indira Gandhi was slain by her Sikh security guards. Tensions between Sikhs and Hindus escalated throughout India. The CPM, a group which includes both Hindus and Sikhs, found the Mainis' intermarriage offensive. As Mr. Maini put it at the asylum hearing, "they didn't want this inter-racial marriage to be successful. They were against it. See, they are biased because I belonged to a Hindu religion and my wife belongs to a Sikh religion."

From 1984 until their escape to this country, the CPM repeatedly threatened the Mainis and physically attacked Vikram. The day of Gandhi's assassination, CPM members accosted Vikram, then seven years old, beat him, stabbed him in the side, and told him to switch religions. The stabbing left Vikram with a permanent scar, which he showed to the immigration judge at the asylum hearing.

Rather than pursue an investigation, the police threatened the Mainis when they reported the CPM's attack against Vikram. Mrs. Maini testified that, after the assault on Vikram and each time a police report was made, "[t]hey told us to run away from here and get out of the place otherwise we will treat you the same way, the way we treat with the people who come here and lodge complaint against our own people."

Vikram became the CPM's frequent target. His mother explained at their asylum hearing that "he is half Hindu and half Sikh. So, he is an easy target for anyone." She added that, "whenever [CPM members] would see him walking alone or he is alone, they would come and slap him." Vikram corroborated his mother's testimony when he explained that, between 1984 and 1992, "whenever they found an opportunity that I was alone, they would harass me or they beat me up." CPM members threatened him at school, informing him that "Hindus should be killed; they should be wiped out." They ordered him to "change my religion." They told him to become a pure Sikh. But Vikram refused: "I would deny it very emphatically and I would say no, what I am, I am." Vikram feared participating in his school's extracurricular activities.

Around the same time as Gandhi's assassination and the 1984 attack against Vikram, Mr. Maini began to receive death threats. Mr. Maini testified that CPM members came to his home one night, banged on the door, and ordered him to "come outside. Step out of the house. We are going to kill you. You are a Hindu." Each time they threatened him, they told him that "wherever you go to any part of India, we are going to finish you off. You cannot be spared." When he reported this incident to the police, they told him "this is between Hindus and Sikhs. We cannot help."

For years, the CPM repeatedly threatened to murder the Mainis. Mrs. Maini testified, "I received many threats," and "I was threatened on the phone many times." Mr. Maini received threats at work. The CPM approached their chauffeur and told him that "[w]e are going to kill your boss." Each of the eight to ten times the Mainis reported such threats, the CPM-controlled police refused to help. Asked why, Mr. Maini testified that the police "directly work under the CPM party. They belong to CPM party ... they just don't listen to us." He elaborated, "anyone who would go to police station and try to lodge a complaint against a CPM person or a case that is lodged then the area counselor person he would go to the police and he would say he is party member. Just leave him."

In 1991, a crowd of CPM members appeared at the Mainis' house. Mr. Maini testified that, while his wife hid in the bathroom, "those people they came in a crowd. They started throwing stones and

was shouting 'come out, step out of the house.' We are going to kill you." But Mr. Maini stayed put because "[i]f I had stepped out they would have killed me." After an hour or two of besieging the family, the crowd left. When Mr. Maini discovered that two people in the crowd worked in his office, he fired them. This triggered an escalation in death threats.

In 1992, the CPM's threats and attacks against the Mainis intensified. On August 3, 1992, CPM members seriously attacked and assaulted Vikram, who was then sixteen years old. Vikram testified that they accosted him and split open his head with a bottle, knocking him unconscious. He was sent to a local clinic. According to the medical report the Mainis offered at their asylum hearing, the attack caused a "head injury with laceration" and required four stitches. The attack left a permanent scar, which Vikram offered to show to the immigration judge. When they reported the attack to the police, the officers refused to write anything down. The 1992 attack against Vikram convinced the Mainis to send him out of the country. As Mr. Maini testified, "we were very scared of our life and I was very scared for him also. So, we took a decision to send him out." Vikram arrived in Los Angeles as a visitor for pleasure on August 10, 1992.

The CPM escalated its threats against the rest of the family in 1992. As Mr. Maini put it, "that was the year when I got maximum threats." He described it as "a very troublesome year. It was difficult to exist. They were just after me. They would threaten me in the office, on the way, at home."

The attacks and threats against the family took their toll at work, until Mr. Maini eventually was forced to resign. The atmosphere in the office grew extremely tense. Mr. Maini's subordinates refused to follow his orders and they frequently shouted slogans at him. He testified that, "I used to keep on thinking as to why these things are happening to me." On May 20, 1993, Mr. Maini's employer sent him a letter demanding his immediate resignation. In the letter, which the Mainis submitted as evidence, the supervisor offered the following justification: "some person are enquiring [sic] about you in the office, and so many unwanted Telephone calls are waiting for you. . . . Inspite [sic] of our several reminders they have not stopped their activities. Office environment is being disturbed."

The Mainis decided to flee India. Mr. Maini explained under cross-examination that he was scared to relocate to another part of India because "they had openly threatened me, that wherever you go to settle or try to settle we are going to kill you. We won't leave you." They sold their personal possessions to pay for the trip and, on June 11, 1993, Mr. Maini arrived in Los Angeles as a visitor for pleasure. His wife and son Arjum followed a few weeks later, on July 26, 1993.

Hearing news reports of bomb blasts in Calcutta and continued ethnic tensions between Sikhs and Hindus persuaded them that returning to India would cost them their lives. Afraid to return, the Mainis applied for asylum before their visa expired. The family worries that, if forced to return, "we could be killed. They will kill us." At the time of their asylum hearing, the CPM still ran West Bengal, the region in which the Mainis lived.

## IMMIGRATION PROCEEDINGS

The asylum hearing was on April 24, 1996. After a hearing on the merits, the immigration judge denied the Mainis asylum and withholding of deportation. He found them credible, noting, "I think that you are a very nice family and I believe that you have tried to tell the truth." He conceded that "this case at first blush sounded like a pure religious case." But he concluded that they could not meet the standard necessary to obtain asylum for two reasons: first, he determined that they had failed to demonstrate persecution by an identifiable group; second, he spec-

ulated, "[i]t is not clear to me that this communist group is interested in the fact that the respondents are of different religions when, in fact, the respondent has testified that the group itself is comprised of people of both religions."

On appeal, the BIA effectively adopted the IJ's findings and decision. It concluded that the Mainis had failed to present sufficient evidence of persecution and police indifference. Like the immigration judge, the BIA concluded that the CPM could not have persecuted them because "the respondents acknowledged that the group they claimed was harassing them was comprised of members of both religions." The BIA also concluded that the Mainis were not entitled to relief because they had called the CPM "gangsters" and because Vikram testified that the CPM "just need[ed] an excuse to harass or torture a person."

## STANDARD OF REVIEW

■■ We must uphold the BIA's determination that an alien is not eligible for asylum if it is supported by reasonable and substantial evidence based on the record as a whole. *INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). Put differently, we will reverse its decision only if the petitioner can demonstrate that the evidence is "such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* It is well-established that we will not uphold the BIA's determination if it relies on personal conjecture and speculation, which we have stressed is no "substitute for substantial evidence." *Lopez–Reyes v. INS,* 79 F.3d 908, 912 (9th Cir. 1996). We accept the Mainis' testimony as undisputed because the immigration judge found their testimony credible and the BIA did not disagree. *Mgoian v. INS,* 184 F.3d 1029, 1033 (9th Cir.1999).

## DISCUSSION

The Attorney General has discretion under 8 U.S.C. § 1158(a) to grant asylum to an alien who is a "refugee." A "refugee" is a person who is unable or unwilling to return to a country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A).

■■ An applicant for asylum can obtain relief under the asylum statute in two ways. First, the person can show past persecution. *Singh v. Ilchert,* 69 F.3d 375, 378 (9th Cir.1995). If an asylum applicant demonstrates past persecution, that person is entitled to a rebuttable presumption of a well-founded fear of future persecution. *Singh v. INS,* 94 F.3d 1353, 1360–61 (9th Cir.1996) (citing 8 C.F.R. § 208.13(b)(1)(i)). "To rebut this presumption, the INS must show by a preponderance of the evidence that, since the time the persecution occurred conditions in the applicant's country of nationality ... have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted were [the person] to return." *Id.* at 1361 (internal quotation marks omitted).

■■ Second, a person can show a well-founded fear of future persecution. *Singh,* 69 F.3d at 378. This fear must be both subjectively genuine and objectively reasonable. *Korablina v. INS,* 158 F.3d 1038, 1044 (9th Cir.1998). An alien satisfies the subjective element by testifying credibly that he genuinely fears persecution. *Id.* The asylum seeker can meet the objective test by presenting evidence "in the record of facts that would support a reasonable fear of persecution." *Duarte de Guinac v. INS,* 179 F.3d 1156, 1159 (9th Cir.1999).

■■ An alien must satisfy a more stringent standard for withholding of deportation than for asylum. *Id.* But if the petitioner shows by a clear probability that he would be persecuted in his home country, the Attorney General must withhold deportation. *Id.* This requires that the

applicant show that it is "more likely than not" that he will suffer persecution on account of a protected ground if we force him to return. 8 C.F.R. § 208.16(b)(1). If an applicant shows past persecution "such that his or her life or freedom was threatened," 8 C.F.R. § 208.16(b)(2), a rebuttable presumption arises that the applicant is entitled to withholding of deportation. *See Surita v. INS,* 95 F.3d 814, 821 (9th Cir.1996).

### A. The Mainis Have Suffered Past Persecution on Account of Religion.

#### 1. The CPM Persecuted the Mainis.

The BIA concluded that the Mainis had failed to present sufficient evidence of either persecution or police indifference. In so concluding, it addressed neither the CPM's repeated threats to kill Mr. and Mrs. Maini nor its physical attacks against Vikram. It also failed to mention the number of times the Mainis sought the police's assistance only to be met with both threats and inattention.

There can be no doubt that the physical attacks, death threats, and harassment the Mainis endured at home, school, and work amount to persecution. Persecution can be inflicted by the government or by a group the government does not control. *Korablina,* 158 F.3d at 1044. As a general matter, we have defined persecution as "the infliction of suffering or harm upon those who differ (in race, religion or political opinion) in a way regarded as offensive." *Id.* at 1043 (internal quotation marks omitted). "The determination that actions rise to the level of persecution is very fact-dependent, though threats of violence and death are enough." *Cordon–Garcia v. INS,* 204 F.3d 985, 991 (9th Cir.2000) (citation omitted); *see also Briones v. INS,* 175 F.3d 727, 728–29 (9th Cir.1999) (en banc) (concluding that the acts of placing Briones on an assassination list and sending him a death threat constituted persecution); *Singh,* 94 F.3d at 1360

("There is no question that persistent death threats and assaults on one's life, family, and business rise to the level of persecution within the meaning of the Act."). Moreover, "we have consistently found persecution where, as here, the petitioner was physically harmed because of his race, religion, nationality, membership in a particular social group, or political opinion." *de Guinac,* 179 F.3d at 1161. The CPM, a group the police repeatedly refused to control, committed persecution by repeatedly attacking Vikram, threatening the rest of the family, and forcing Mr. Maini to resign from work. These cumulative instances of death threats and physical attacks escalated in 1992 until, as was the case in *Korablina,* 158 F.3d at 1045, "[t]he nature and increasing frequency of the attacks against [the Mainis] ... demonstrated to [them] the urgency of [their] leaving." No reasonable factfinder could conclude that the CPM's treatment of the Mainis did not constitute persecution.

#### 2. The CPM Persecuted the Mainis On Account of Religion.

Both the Immigration Judge and the BIA concluded that the CPM could not have persecuted the Mainis for being an interreligious family because it is comprised of people who practice different religions. We reject this reasoning as erroneous and unsupported by substantial evidence.

The persecuting group's motive, rather than its demographics, is crucial to a determination of whether a petitioner is entitled to asylum. *Elias–Zacarias,* 502 U.S. at 482, 112 S.Ct. 812; *Canas–Segovia v. INS,* 970 F.2d 599, 601 (9th Cir.1992) (noting that "the victim needs to show the persecutor had a protected basis ... in mind in undertaking the persecution"); *see also Sangha v. INS,* 103 F.3d 1482, 1486 (9th Cir.1997). Indeed, we have previously recognized that a person can be persecuted by members of the same group. In *Andriasian v. INS,* 180 F.3d 1033 (9th Cir.

1999), for example, we found that a person could suffer persecution at the hands of his own people. Mr. Andriasian, an ethnic Armenian, had lived in Azerbaijan his entire life until ethnic tensions there forced him to relocate to Armenia. Life in Armenia, however, turned out to be equally dangerous because fellow Armenians accused Mr. Andriasian of being loyal to the Azerbaijanis. *Id.* at 1037. In concluding that the petitioner had not resettled in Armenia for purposes of seeking asylum, we acknowledged that he had been "harassed and threatened while there, and told to return to Azerbaijan." *Id.* at 1042. That a person shares an identity with a persecutor does not, in other words, foreclose a claim of persecution on account of a protected ground. *See id.* at 1046–47 ("The purpose of [the resettlement] regulations is to ensure that if this country denies a refugee asylum, the refugee will not be forced to return to a land where he would once again become a victim of harm or persecution."). If an applicant can establish that others in his group persecuted him because they found him insufficiently loyal or authentic to the religious, political, national, racial, or ethnic ideal they espouse, he has shown persecution on account of a protected ground. Simply put, persecution aimed at stamping out an interfaith marriage is without question persecution on account of religion.

■ In light of our country's shameful history of bigotry, we find it disturbing that the BIA should categorically reject the Mainis' claim of persecution on the ground that the CPM is diverse. The Supreme Court has recognized that there are institutions which can and do tolerate diversity while at the same time opposing intermarriage. In *Bob Jones University v. United States,* 461 U.S. 574, 580, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983), the Court described a university admission policy that permits "unmarried Negroes to enroll; but a disciplinary rule prohibits interracial dating and marriage." Indeed,

the Court condemned this policy as discriminatory, reasoning that "[a]lthough a ban on intermarriage or interracial dating applies to all races, decisions of this Court firmly establish that discrimination on the basis of racial affiliation and association is a form of racial discrimination." *Id.* at 605, 103 S.Ct. 2017 (citations omitted). Thus, it does not follow from the mere fact that a group is diverse that it does not engage in persecution on account of a characteristic shared by some of its members. We hold that any group, even a diverse one, that persecutes people for marrying between races, religions, nationalities, social group memberships, or people of certain political opinion is one that commits persecution on account of a protected ground. In this case, the persecution was on account of religion because the CPM objected to the Mainis' interfaith practices.

■ To the extent the BIA alternatively concluded that the record did not show persecution on account of religion, we find that its conclusion is not supported by substantial evidence. The IJ explained in his decision that "it is not clear" to him why the CPM would persecute the Mainis for being intermarried when the CPM itself was comprised of both Hindus and Sikhs. The BIA agreed. An assertion about the CPM's position on intermarriage and what it would and would not do given its religious composition amounts to nothing more than conjecture and speculation. We have said it before and we say it again: conjecture and speculation can never replace substantial evidence. *Cordon–Garcia,* 204 F.3d at 993; *Lopez–Reyes,* 79 F.3d at 912.

Contrary to the BIA's assertion, the record in this case compels a finding that the CPM objected to the Mainis' marriage and persecuted them for it. All three witnesses testified that they were victims of threats and attacks because of their interfaith practices. The Mainis gave several examples of such persecution, the most egregious of which involved their seven-

year-old son, Vikram. The CPM frequently and violently attacked Vikram. During one such attack, the CPM beat and stabbed him for being half Sikh and half Hindu, and told him to change his religion and become a pure Sikh. On another occasion, they knocked Vikram over the head with a bottle, which rendered him unconscious and required medical attention. They attacked him because, his mother explained, "he is half Hindu and half Sikh. So, he is an easy target for anyone." This testimony was found to be credible, and the beating was documented with corroborating evidence.

Vikram's experiences are similar to those endured by the petitioner in *de Guinac,* 179 F.3d at 1159–60. There, a member of an indigenous ethnic group endured repeated beatings at the hands of his superior officers. When the superiors beat him and other indigenous men, they called them "chickens," "sons of bitches," and "Indian pigs." *Id.* at 1160. We held that these "repeated beatings coupled with explicit expressions of ethnic hatred—all because he was an 'Indian' "—compelled a finding of past persecution on account of a protected ground. *Id.* at 1162. Similarly, the "repeated beatings coupled with explicit expressions of [religious] hatred" by the CPM against Vikram compel a finding of persecution on account of religion. *Id.*

■ The CPM not only aimed its attacks against Vikram, but also targeted the entire family. From the time of Gandhi's assassination in 1984 until they departed from India in 1993, the CPM repeatedly threatened to kill the Mainis. They told Mr. Maini that they would murder him because he is a Hindu. They

subjected his family to such treatment because, as Mr. Maini explained at the asylum hearing, they were opposed to his intermarriage. Faced with this record, no reasonable factfinder could conclude that the persecution the Mainis suffered was not on account of religion.[1]

■ We *turn now to the* BIA's alternative grounds for denying the Mainis' asylum claim. First, the BIA's conclusion that they cannot obtain asylum because they called their persecutors "gangsters" is wholly without merit. During their asylum hearing, the Mainis consistently identified the people who persecuted them as CPM members. They knew the party to which their attackers belonged because, as Mrs. Maini explained, "we are living in the state of Bengal for a long time. We know who is who and in every area there [sic] have small offices." As the BIA pointed out, both Vikram and Mr. Maini also called the CPM "gangsters." But the record shows that they used the terms CPM and "gangsters" interchangeably. At one point, for example, the INS asked, "[s]o, it was gangster [sic] who were harassing you is that correct?" Vikram answered: "Right, they were gangsters. But, they were people who belong to communist party. So, they were the people who belonged to the communist party and they were gangsters who belonged to CPM." Read in context, the reference to the CPM as "gangsters" proves only that Vikram regarded the CPM's methods of beating him, threatening him, and demanding that he change his religion as akin to those of gangsters and not, as the BIA wrote, that

---

1. Circuit law precludes any argument that, because one of the CPM's motivations was economic, the Mainis cannot obtain relief. Mr. Maini testified that the CPM threatened him both because he had married a Sikh and because he "was on a better post and they were jealous of me." In *Borja v. INS,* 175 F.3d 732, 736 (9th Cir.1999) (en banc) (internal quotation marks omitted), we held that an applicant for asylum need only present "evidence from which it is reasonable to believe

that the harm was motivated, at least in part, by an actual or implied protected ground." The Mainis provided ample evidence that the persecution they suffered was motivated primarily on account of religion. That CPM members may have had an additional economic reason to persecute Mr. Maini does not affect our conclusion that the CPM persecuted him and his family at least in part on account of a protected ground.

Vikram was beaten by apolitical thugs.[2] Name-calling, particularly by those who have suffered the tragedy of persecution, does not undermine a person's claim to asylum. In fact, we believe that using such terms strengthens a claim to asylum because it can be an indication of how much the person suffered before fleeing to this country. *Cf. Akinmade v. INS*, 196 F.3d 951, 955–56 (9th Cir.1999) (recognizing that petitioner's fraud and misrepresentation can support a claim of past persecution where it reflects the need to flee); *Turcios v. INS*, 821 F.2d 1396, 1401 (9th Cir.1987) (same).

■ Second, we find the BIA's focus on the term "excuse" as a basis for denying the Mainis asylum equally unpersuasive. Vikram testified at one point that the CPM "just need an excuse to harass or torture a person." Mr. Maini similarly explained that the "CPM people they are very volatile and they believe in communist ideology. So, they just need an excuse to bother people." We have long recognized that asylum hearings frequently generate mistranslations and miscommunications. *See, e.g., Akinmade*, 196 F.3d at 956; *Vilorio–Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir.1988). Mindful of the language barrier at the Mainis' hearing, we believe that the Mainis meant to say that the CPM needed a "reason" before it began a campaign of persecution. And, in this case, the reason was the Mainis' intermarriage. Indeed, the Mainis consistently testified that the CPM objected to their interfaith practices and targeted them because of their religions.

In sum, the experiences the Mainis endured compel the conclusion that they suffered persecution on account of religion. They were subjected to consistent threats and beatings because they intermarried and practiced both the Sikh and Hindu religions. This was persecution on account of religion.

## B. The Mainis Are Eligible for Asylum.

■ Having established past persecution on account of a protected ground, the Mainis are entitled to a rebuttable presumption of a well-founded fear of persecution. *Singh*, 94 F.3d at 1360–61. The BIA did not accord them this presumption because it concluded that they had not suffered past persecution on account of a protected ground. Because we have concluded that the Mainis did suffer past persecution, "[i]t is the [INS'] burden to show by a preponderance of the evidence that petitioner's reasonable fear of future persecution was dissipated by the changed country conditions." *Vallecillo–Castillo v. INS*, 121 F.3d 1237, 1240 (9th Cir.1996); *see also* 8 C.F.R. § 208.13(b)(1)(i). But the INS has not met this burden. In fact, the INS failed to introduce any evidence of changed country conditions into the record, instead relying on the argument that the Mainis had presented insufficient evidence of past persecution. We have already held that where, as here, the INS fails to meet its burden by presenting any evidence, it also fails to rebut the presumption of well-founded fear of persecution. *Vallecillo–Castillo*, 121 F.3d at 1239–40; *see also Andriasian*, 180 F.3d at 1043 (reasoning that the INS' failure to challenge presumption of entitlement to withholding of deportation requires the court to find petitioner eligible for withholding). Accordingly, we hold that the Mainis are "statutorily eligible for asylum." *Prasad v. INS*, 101 F.3d 614, 617 (9th Cir.1996).

## C. The Mainis Are Entitled to Withholding of Deportation.

■ The Mainis are also entitled to a rebuttable presumption of entitlement to withholding of deportation. This is because they have shown past persecution

---

**2.** Moreover, even if they were merely gang members, the Mainis could still show persecution for purposes of seeking asylum as long as the group was one the government "decline[d] to control." *Korablina*, 158 F.3d at 1044.

threatening their "li[ves] or freedom." *Surita v. INS*, 95 F.3d 814, 821 (9th Cir. 1996) (citing 8 C.F.R. § 208.16(b)(2)). To rebut this presumption, the INS must show by a preponderance of the evidence that the conditions in India have changed to such an extent that it is no longer more likely than not that they would face persecution there. *de Guinac*, 179 F.3d at 1164. As described above, the INS has failed to present any evidence to rebut this presumption. We therefore conclude that the Mainis' deportation must be withheld. *Id.; see also Vallecillo–Castillo*, 121 F.3d at 1240.

## CONCLUSION

We grant the Mainis' petition for review. The BIA erroneously denied their request for asylum and withholding of deportation. We hold "that the evidence [the Mainis] presented was so compelling that no reasonable factfinder could fail to find the requisite fear of persecution." *Elias–Zacarias*, 502 U.S. at 483–84, 112 S.Ct. 812. Because the INS has failed to rebut the presumptions that arise from this ruling, the Mainis are statutorily eligible for asylum and entitled to withholding of deportation. We remand this case to the BIA with instructions to present this matter to the Attorney General for the exercise of her discretion. Any future petitions the Mainis file shall be assigned to this panel.

Petition GRANTED; REVERSED and REMANDED