**Andaranik BANDARI, Petitioner,**

v.

**IMMIGRATION AND
NATURALIZATION SERVICE,
Respondent.**

**No. 98–71189.**

United States Court of Appeals,
Ninth Circuit.

Submitted April 3, 2000 [1]

Filed Sept. 26, 2000

---

1. The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R.App. P. 34(a)(2).

Andaranik Bandari, Pro per, Glendale, California, for the petitioner.

Kurt B. Larson, United States Department of Justice, Office of Immigration Litigation, Washington, D.C., for the respondent.

Before: HUG, Chief Judge, FERGUSON, Circuit Judge, and RESTANI, Judge.[2]

FERGUSON, Circuit Judge:

Andaranik Bandari, a native of Iran, petitions for review of the Board of Immigration Appeals' ("BIA") decision denying his claim for asylum and withholding of deportation. Bandari is a twenty-five-year old Armenian Christian who fled Iran at age nineteen after being tortured for, and convicted of, interfaith dating. We have jurisdiction pursuant to 8 U.S.C. § 1105a (1996), as amended by section 309 of the Illegal Reform and Immigrant Responsibility Act of 1996. We conclude that the BIA erred in affirming the IJ's adverse credibility determination. We deem him credible, grant his petition for review, and hold that he is eligible for asylum.

## FACTUAL BACKGROUND

The following factual background is drawn from Bandari's testimony, his application for asylum, and corroborating evidence in the record. Before fleeing to the United States, Bandari lived with his grandparents in Teheran. When he was still in high school, he met a Muslim girl named Afsaneh Homaunfar ("Afsaneh"). She lived across the street, and for the first year that he knew her, they just stared at each other. After a year or so, Bandari and Afsaneh began to meet in secret. He knew that it was illegal for them to date, but as he explained during his asylum hearing, "I loved her very much and I wanted to get acquainted with

her." The two met clandestinely over a period of a month about eight times.

One night in January of 1994, Bandari and Afsaneh embraced in the street. Three uniformed police officers saw them. After informing the two that they had broken a law against public displays of affection, they handcuffed Bandari.

When the police discovered that Bandari was a Christian, and Afsaneh a Muslim, their behavior suddenly changed. They called Bandari a "dirty Armenian" and told him that he had "no right to go out with a Persian girl." They hit him so hard that he fell to the ground. While Bandari tried to protect his face, the police officers continued to beat and kick him all over.

The police then took Bandari to the police station. They whipped him with a rubber hose and threw him into isolation. For four straight days, they demanded that he confess to raping Afsaneh and they beat him when he refused. As he put it at his asylum hearing, "I didn't sign, they used to come and beat me up every day, so—so that I sign those papers, but I didn't." The beatings were so severe that he lost consciousness several times.

On the fifth day, the police took Bandari to court. The judge informed him that he had violated the Ayatollah's edict prohibiting interfaith relationships. The edict, which Bandari submitted as evidence, provides that, "an infidel is one who does not believe in the prophethood of Mohammed" and who is therefore "unclean." It also specifically forbids non-Muslims from marrying Muslim women. The judge ordered Bandari to convert to Islam or face punishment. When he refused to change his religion, Bandari testified, "[t]hey told me that I had broken the law by going out with a Persian girl and they told me that my punishment will be making me stand underneath a wall and being thrown rocks on me until death." Because of his youth, however, the judge reduced the sentence

**2.** Honorable Jane A. Restani, Judge, United States Court of International Trade, sitting by designation.

to seventy-five lashes and one year in prison. Bandari was released only after his grandfather paid a bribe to a government official. He went home, where he spent three weeks in bed recovering from the injuries the police had inflicted.

A few weeks later, when Bandari was out walking one day, two police officers recognized him. They beat him for approximately ten minutes. While they pummeled him, they yelled, "[y]ou raper [sic] of Moslem girl. You bastard Armenian. Leave and go and live in your Christian country." Bandari managed to break free, and he ran to a friend's house where he hid until his grandfather brought him money to escape from Iran.

Bandari fled Iran the following day. He testified that he traveled on foot first to Turkey and that, during the trip, "I wasn't thinking of my pain because I wanted just—just wanted to escape and—and run for my life because they were going to kill me." When he was in Turkey, his grandfather told him that he had been charged with raping Afsaneh and urged him not to return. Two weeks later, he traveled to Germany, where he stayed and attended school for approximately four months.

Bandari arrived in this country on August 29, 1994, as a visitor for pleasure. His visa expired one year later. He has heard that a rape charge is still pending against him in Iran. On April 11, 1996, he applied for asylum because, as he said at the asylum hearing, "[i]f I go back, they'll kill me."

In addition to Bandari's testimony and application for asylum, the record contains several other sources of information. First, he submitted a birth certificate which indicates that he and his mother are Christian. Second, he submitted a copy of the religious edict prohibiting interfaith dating and marriage.

The INS submitted the State Department report on Iran as evidence. It contains several passages that corroborate Bandari's account of religious persecution. The report states, for example, that "[t]he Government is dominated by Shia Muslim clergy." General conditions in Iran are perilous, as the following passage makes clear:

> The Government's human rights record remains poor; there was no evidence of significant human rights improvement during the year. Systematic abuses include extrajudicial killings and summary executions; disappearances; widespread use of torture and other degrading treatment; harsh prison conditions; arbitrary arrest and of the freedoms of speech, press, assembly, association, religion and movement.

The report goes on to explain that, "[t]he Government does discriminate on the basis of religion and sex" and notes that Christians "suffer varying degrees of officially sanctioned discrimination." Bandari's claim that he was tortured comports with the Department's description that:

> Credible reports indicate that security forces continue to torture detainees and prisoners. Common methods include suspension for long periods in contorted positions, burning with cigarettes, and, most frequently, severe and repeated beatings with cables or other instruments on the back and on the soles of the feet. A new law entered into force on July 10 that reinforces Islamic punishments such as flogging, stoning, amputations, and public executions.

His account of being accused of rape because of his religion is similarly consistent with the State Department's observation that, "[t]he Government often charges members of religious minorities with crimes rather than apostasy." Moreover, Bandari's claim that the judge charged him with a violation of a religious edict is supported by the State Department's report that, "[t]he traditional court system is not independent and is subject to government and religious influence" and "the Government advises judges to base their decisions on Islamic law." His fear of return is understandable in light of the report's description that, "[r]eligious minorities suffer discrimination in the legal

system, ... incurring heavier punishments than Muslims."

## IMMIGRATION PROCEEDINGS

Bandari's asylum hearing was on June 16, 1997. He spoke through an interpreter and without the assistance of counsel. That day, the immigration judge ("IJ") issued an oral decision in which she explained that "the Court does not find that the respondent has testified in a forthright and credible manner." She cited several reasons for her adverse credibility finding: (1) a discrepancy between Bandari's testimony that the Iranian police beat him with a rubber hose for ten to twenty minutes before they detained him and his statement in his application that he was sentenced to seventy-five lashes and one year in prison; (2) a discrepancy between his statement that he was whipped seventy-five times on the street and a later assertion on cross-examination that he was beaten in the police station; (3) his failure to include in his application that he was beaten with a rubber hose seventy-five times in light of the IJ's belief that "if the respondent was beaten with a rubber hose 75 times that the respondent would have mentioned this on his asylum application"; (4) a discrepancy between his testimony that his grandfather paid a sum of money to a government official to secure his release and a statement in his asylum application that his family spent a sum to an influential Muslim man; (5) the IJ's belief that it is "completely and wholly implausible that the respondent would have been beaten for a period of 20 minutes with a rubber hose and not bleed"; and (6) "[t]he Court does not believe that the German government would allow an individual who entered the country on a visitor's visa to attend college."

The IJ alternatively held that, if believed, Bandari had failed to establish persecution on account of a protected ground. She reasoned, "[t]he Court believes that any man, whether Christian or Muslim who was caught openly kissing a woman in Tehran would have been subjected to the same type of treatment as the respon-

dent." She elaborated that "the respondent was imprisoned because he violated the law.... The Court believes that this is indeed a case of prosecution and not persecution."

The BIA affirmed the IJ's denial of Bandari's application. It deferred to the IJ's adverse credibility finding. The BIA further held that Bandari had failed to establish persecution on account of a protected ground because the evidence, if credited, showed merely that he had been prosecuted for violating a law forbidding unmarried men and women from appearing together in public.

## DISCUSSION

### A. The Adverse Credibility Determination

 The BIA's adverse credibility findings must be supported by substantial evidence in the record. *See Shah v. INS,* 220 F.3d 1062, 1066–67 (9th Cir.2000). When the BIA deems a person to be not credible, it must do so on an individualized basis and provide specific reasons for its disbelief. *Id.* at 1069–70. Where, as here, the BIA adopts the IJ's credibility determination, we look through the BIA's decision to examine the IJ's reasons for deeming the person not credible. *See Garrovillas v. INS,* 156 F.3d 1010, 1013 (9th Cir.1998). With these general principles in mind, we conclude that the adverse credibility determination in this case rested on impermissible grounds.

#### 1. *A Discrepancy Between His Application and his Testimony on Being Beaten with a Hose.*

 The IJ based her adverse credibility finding on an inconsistency between Bandari's application, in which he states that he was sentenced to seventy-five lashes, and his testimony that he was whipped seventy-five times on the day the police caught him with Afsaneh. During the asylum hearing, Bandari consistently testified that he was whipped seventy-five

times on the day the police picked him up. When the judge confronted him with the inconsistency between his testimony and his application, he repeated that he had been beaten seventy-five times on that day and not after the judge pronounced his sentence.

■ The IJ erred in resting her adverse credibility determination on the inconsistency in dates between Bandari's application and his testimony. Any alleged inconsistencies in dates that reveal nothing about a petitioner's credibility cannot form the basis of an adverse credibility finding. Indeed, we have frequently characterized "discrepancies in dates which reveal nothing about an asylum applicant's fear of his safety" to be "minor inconsistencies" that cannot form the basis of an adverse credibility finding. *Vilorio–Lopez v. INS,* 852 F.2d 1137, 1142 (9th Cir.1988); *see also Damaize–Job v. INS,* 787 F.2d 1332, 1337 (9th Cir.1986) (concluding that discrepancy between application and testimony on birthdates of petitioner's children could not form a proper basis for an adverse credibility finding). The discrepancy in this case relates to the date on which Bandari received a particular type of beating with a specific kind of instrument among many attacks the police inflicted over several days. There is no indication anywhere in the record as to why the petitioner would lie about the date on which the police whipped him. We therefore cannot affirm the IJ's adverse credibility finding on this ground.

■ Moreover, as we recently explained, "we will not uphold an adverse credibility finding unless the IJ or BIA specifically explains the significance of the discrepancy or points to the petitioner's obvious evasiveness when asked about it." *Shah v. INS,* 220 F.3d at 1068; *see also Vilorio–Lopez,* 852 F.2d at 1142. The IJ in this case failed to state the significance of the inconsistency in dates or to point us to any obvious evasiveness in Bandari's testimony when she confronted him with it. We cannot affirm the credibility finding on this basis.

2. *A Discrepancy Between his Statement on Direct Examination that he Was Beaten on the Street and his Testimony During Cross–Examination that he was Beaten at the Police Station.*

■ The IJ rested her adverse credibility determination on a discrepancy between Bandari's statement on direct examination that the police beat him on the street and his later assertion that the police beat him in the police station. During the hearing, Bandari explained that he was beaten and whipped on the street. Later, when the government asked him where he was beaten with the hose, he stated, "they took me in where the police were. There—there—that's where they gave me the 75 lashes."

■ The discrepancy was an improper basis for an adverse credibility finding. The record indicates that Bandari only once stated that the police whipped him with the hose on the street. Otherwise, he consistently stated that he was beaten both on the street and in the police station, and that the police specifically lashed him at the station. A minor inconsistency in identifying the location of a person's persecution, in light of otherwise consistent testimony, cannot form the basis of an adverse credibility finding. This is especially true given that "[w]e have long recognized that asylum hearings frequently generate mistranslations and miscommunications." *Maini v. INS,* 212 F.3d 1167, 1176 (9th Cir.2000). Thus, the IJ impermissibly rested her adverse credibility finding on this basis.

3. *An Omission in his Application that the Police Beat him on the Street 75 Times.*

■ In examining Bandari's application, the IJ rested her adverse credibility determination on her view that "[t]he respondent testified that he received 75 lashes, but nowhere did he state that he was beaten with a rubber hose.... The Court believes that if the respondent was beaten with a rubber hose 75 times that the re-

spondent would have mentioned this on his asylum application." This basis was impermissible for two reasons. First, we have previously held that the mere omission of details is insufficient to uphold an adverse credibility finding. *See, e.g., Shah*, 220 F.3d at 1069; *Lopez–Reyes*, 79 F.3d at 908, 911. In this case, Bandari wrote in his application that "I was beaten and I was whipped, and imprisoned in the Islamic Republic of Iran." Bandari's failure to identify the specific instrument which the police used to whip him is the type of omitted detail that cannot form a proper basis of an adverse credibility finding.

▮ Moreover, the IJ's subjective view of what a persecuted person would include in his asylum application has no place in an adverse credibility determination. In asserting that Bandari should have included the specific beating in his application, the IJ placed herself in his shoes and imagined what she would have included in her application given the instrument the police used against him. This amounts to nothing more than her subjective beliefs and, as we have made abundantly clear, "conjecture and speculation can never replace substantial evidence." *Maini*, 212 F.3d at 1175. Thus, the IJ erred in basing an adverse credibility determination on this ground.

4. *A Discrepancy Between his Testimony that his Grandfather Bribed a Government Official to Gain his Release, and his Statement in his Application that his Family Paid a Lot and Through an Influential Muslim Man Obtained his Release.*

▮ The IJ concluded that Bandari was not credible based on a perceived inconsistency between his testimony that his "grandfather had actually paid one million tumans to a government official to secure his release" and his statement in the application for asylum that "his family spent a lot of money and through an influential Muslim man was able to secure his release." There is no inconsistency. In his application, Bandari wrote "my family had spend [sic] a lot of money and through

an influential Moslem man, I was released from prison ..." This is wholly consistent with his testimony that his grandfather, a family member, paid a government official, an influential and possibly Muslim man, to secure his release. The IJ's determination that these two statements conflict is unsupported by the record.

5. *The IJ's Belief that Bandari Should have Bled Given the Severity of the Beating He Suffered.*

▮ The IJ deemed Bandari not credible, reasoning that "[t]he Court finds it completely and wholly implausible that the respondent would have been beaten for a period of 20 minutes with a rubber hose and not bleed. This simply is incredible and implausible to this Court." During the asylum hearing, Bandari testified repeatedly that, among other attacks, the police whipped him weekly with a hose, which caused his back to swell, but not to bleed. The IJ's assertion that his account was unbelievable is based solely on her subjective view of when a person should bleed given her view of the severity of the flogging. Personal beliefs cannot be substituted for objective and substantial evidence. *See Shah*, 220 F.3d at 1071–72 (citations omitted).

6. *The IJ's Belief that He Could Not have Legally Attended College in Germany on a Visitor's Visa.*

▮ The IJ based her adverse credibility finding on a belief that Bandari testified untruthfully that he had attended college when he lived in Germany because "[t]he Court does not believe that the German government would allow an individual who entered the country on a visitor's visa to attend college." During the hearing, both the IJ and the lawyer for the government repeatedly questioned Bandari about whether he could have legally attended college. Neither confronted him with any German law or document showing that he did not or could not attend college there. Indeed, in holding that he was not credible

based on his testimony that he attended college, the IJ did not cite to any German laws or to any other documents in the record. The IJ's belief about the German government's policies on educating foreign citizens again amounts to nothing more than her conjecture and speculation. Thus, this was an impermissible basis for an adverse credibility finding. *See Shah,* 220 F.3d at 1071–72.

**B. Past Persecution on Account of Religion**

■ Having concluded that the adverse credibility determination rests on impermissible grounds, we are compelled to find that Bandari suffered past persecution on account of a protected ground. *See INS v. Elias–Zacarias,* 502 U.S. 478, 481, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992). After adopting the IJ's adverse credibility finding, the BIA went on to alternatively hold that Bandari had failed to make the requisite showing of past persecution. In so holding, the BIA disregarded evidence showing that Bandari was attacked not for violating a neutral law against embracing in public, but for violating a religious edict prohibiting members of different religions from commingling.

■ The Iranian police subjected Bandari to persecution. "[W]e have consistently found persecution where, as here, the petitioner was physically harmed because of his race, religion, nationality, membership in a particular social group or political opinion." *Duarte de Guinac v. INS,* 179 F.3d 1156, 1161 (9th Cir.1999); *see also Maini,* 212 F.3d at 1174 (concluding that physical attacks constituted persecution). As we have made clear, moreover, "persecution aimed at stamping out an interfaith marriage is without question persecution on account of religion." *Maini,* 212 F.3d at 1175. The police in this case beat Bandari repeatedly and daily demanded his confession to a crime he did not commit because they found him embracing a Muslim woman. No reasonable factfinder could conclude that the CPM's treatment of Bandari did not constitute persecution.

We have previously drawn a distinction between legitimate criminal prosecution and persecution based on a protected ground. *See, e.g., Singh v. Ilchert,* 63 F.3d 1501 (9th Cir.1995); *Blanco–Lopez v. INS,* 858 F.2d 531, 534 (9th Cir.1988) ("Blanco–Lopez testified that, while a captive of the security forces, he was threatened with death unless he admitted to being a guerrilla. We can hardly characterize this as an example of legitimate criminal prosecution."). Our opinion in *Singh,* 63 F.3d at 1508, controls this case. There, as here, the police arrested the petitioner and beat him repeatedly for several days. *Id.* at 1504. Throughout his detention, they asked him what he knew about anti-government militants. *Id.* The BIA, as it did in this case, held that the mistreatment the petitioner had suffered was not on account of a protected ground, but rather represented a legitimate criminal prosecution. *Id.* at 1508. We reversed, holding that the "investigation" was aimed at stamping out political opposition to the government, even if it was under the guise of a lawful investigation.

■ We come to a similar conclusion in this case. Contrary to the BIA's holding, the record shows that the police's initial stop may have been mere law enforcement, but the subsequent beatings they inflicted were clearly based on Bandari's religion. Indeed, the Iranian authorities beat, tortured, detained, and sentenced him not for violating a neutral law against embracing, but rather for interfaith dating. While the police beat him, they called him a "dirty Armenian," told him that he had no right to be with a Muslim woman, accused him of raping Afsaneh, and ordered him to return to his "Christian country." That the police initially approached Bandari to enforce a neutral law does not affect our holding that they later attacked him for interfaith dating. This is because as we have explained, an asylum applicant need only present "evidence from which it is reasonable to believe that the harm was motivated, at least in part, by an actual or

implied protected ground." *Borja v. INS,* 175 F.3d 732, 736 (9th Cir.1999) (en banc); *see also Ratnam v. INS,* 154 F.3d 990, 996 (9th Cir.1998) ("Torture in the absence of any legitimate criminal prosecution, conducted *at least in part on account of political opinion,* provides a proper basis for asylum and withholding of deportation even if the torture served intelligence gathering purposes.") (emphasis added). We conclude that no reasonable factfinder could hold otherwise and we therefore reverse the BIA's alternative holding.

C. Well–Founded Fear of Persecution

■ Because Bandari has shown that he suffered past persecution on account of a protected ground, he is entitled to a presumption that he will face persecution in the future. 8 C.F.R. § 208.13(b)(1)(i). The BIA failed to accord him this presumption because it concluded that he had failed to show past persecution. We do not remand to the BIA "where the record clearly shows that the country conditions material in the record will not serve to rebut the presumption." *Chand v. INS,* 222 F.3d 1066, 1078 (9th Cir.2000) (citations omitted). This is the case, for example, where "[t]he evidence ... compels the conclusion that conditions have not changed sufficiently to rebut the presumption that arose ..." *Id.*

■ The evidence presented here compels our conclusion that Bandari will be persecuted in the future. There is no evidence in the record to indicate that conditions have improved in Iran for religious minorities. In fact, as detailed above, the report suggests that Bandari, a Christian who broke a religious edict prohibiting interfaith commingling, would face torture if not death in Iran. No reasonable factfinder could conclude that the country conditions information in the record is sufficient to rebut the presumption of future persecution. We therefore do not remand on the question. *See Chand,* 222 F.3d at 1078.

D. Withholding of Deportation

■ Bandari is entitled to withholding of deportation if he has established a "clear probability of persecution." *Duarte de Guinac,* 179 F.3d at 1164. We must accord him a presumption of entitlement to withholding of deportation if he shows past persecution which threatened his life. *Id.* "To rebut this presumption, the INS must show by a preponderance of the evidence that the conditions in India have changed to such an extent that it is no longer more likely than not that they would face persecution there." *Maini,* 212 F.3d at 1178. We conclude that Bandari is entitled to withholding of deportation for the same reasons that compel our conclusion that he is eligible for asylum. *See Chand,* 222 F.3d at 1078.

CONCLUSION

For the foregoing reasons, we hold that Bandari is eligible for asylum and entitled to withholding of deportation. We remand for the Attorney General to exercise her discretion with respect to Bandari's asylum claim, and for the grant of withholding of deportation.