

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-21-2008

# Lita v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 07-1804

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Lita v. Atty Gen USA" (2008). *2008 Decisions.* Paper 1176.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1176

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 07-1804
_____

MEVLAN LITA,
                                        Petitioner,

v.

ATTORNEY GENERAL OF THE UNITED STATES

_____

On a Petition For Review of an Order
of the Board of Immigration Appeals
Agency No. A98-690-014
Immigration Judge: Henry S. Dogin

_____

Submitted Pursuant to Third Circuit LAR 34.1(a)
April 16, 2008
Before: MCKEE, NYGAARD and ROTH, <u>Circuit</u> <u>Judges</u>

(Opinion filed:  May 21, 2008)
_____

OPINION
_____


PER CURIAM

    Petitioner Mevlan Lita, a native and citizen of Albania, was admitted to the United

States at Miami, Florida on or about December 3, 2003 as a non-immigrant B2 visitor for

pleasure with authorization to remain for a temporary period not to exceed June 2, 2004.

He remained in the United States beyond that date without authorization.  Lita was served

with a Notice to Appear on February 17, 2005, alleging that he was removable under Immigration & Nationality Act § 237(a)(1)(B) as an overstay. He conceded that he was removable on that basis. On December 23, 2004, he submitted his original applications for asylum under INA § 208(a), 8 U.S.C. § 1158(a), and withholding of removal under INA § 241(b)(3), 8 U.S.C. § 1231(b)(3), and the Convention Against Torture, 8 C.F.R. §§ 1208.16(c), 1208.18, claiming a fear of persecution on account of political opinion. He also applied for voluntary departure as an alternative to removal.

Lita asserted in his original December 2004 application, A.R. 223-234, that his extended family are well-known members of the Democratic Party in Albania and opponents of the old Communist Party. His grandfather, Rushit Lita, and brothers were killed by Albania's State Intelligence Service (SHISH), the "secret police." His uncles were arrested and tortured. His father was an activist within the party, and Lita himself was a member of the Youth Forum. Lita and his family returned to their hometown in March 1988, just as the political situation in Albania began to change. The Democratic Party won the election in 1992, but by 1997, the new Socialist Party was leading the country by force. During an organized peaceful protest on a date not specified, Lita was arrested and beaten for three days, and threatened because of his work on behalf of the Democratic Party.

In September 1998, while attending a funeral for Democratic Party hero Azem Hajdari, Lita was beaten by police once again. He was unable to find work after

graduating from the university because of his political opposition to the Socialists. In September 2001, he and his friends were arrested at a demonstration for the Democratic Party. They were beaten for two days before being released. They were warned to stop voicing support for the Democratic Party. Again in April 2002, while walking home late at night, Lita was accosted by agents of the secret police, beaten, and left lying on the street. Again he was threatened. Lita decided to leave Albania. He left in December 2003.

On July 28, 2005, Lita submitted a counseled second application for asylum, A.R. 179-221, which he supported with a number of exhibits including a copy of his passport, a marriage certificate, documentation of his and his family's membership in the Democratic Party, and documentation of his and his family's membership in the Association of the Politically Punished of Albania. In a statement in support of this application, Lita asserted that, in November 1945, his family was taken to a labor camp in Berat.[1] The Communist Party executed his grandfather, great uncle, and cousins in 1946. In April 1982, his uncle was arrested, tortured, and imprisoned for 16 years, and he did not achieve release until the Communist government was overthrown. Lita's father was only a child when he was taken to the labor camp. Members of his family were labeled "Kulaks," which means "enemy of the government" to the Communists. Until 1991, no one in his family, including Lita himself, was permitted to receive an education beyond

---

[1] Lita was not born until March 9, 1978.

the eighth grade. Lita discussed the rise of the Democratic Party and its downfall in 1997 as a result of financial corruption. In March 1997, Albania went through a period of lawlessness. Former members of the secret police declared "war" on members of the Democratic Party and attacked them with impunity. Lita actively campaigned for the Democratic Party prior to the June 1997 elections, which brought him to the attention of the police.

In this statement in support of the second asylum application, Lita went on to describe specific incidents in support of his claim of persecution. First, he stated that he was beaten on May 1, 1999 after participating in a hunger strike. Second, he stated that, on August 10, 1999, he and three friends were severely beaten in Fushe Kruje, and threatened and interrogated in connection with their political activity on behalf of the party. One friend was hospitalized for three days, and Lita suffered severe back pain for two weeks. The Democratic Party lodged a formal complaint with the Socialist Party about this incident. On September 13, 1999, his family's store was destroyed. He went to the police station to complain, but the police detained him for 12 hours and badly beat him. He was threatened with imprisonment for his political opposition to the Socialist Party. It was at that point that he escaped Albania with the help of a friend.

At his removal hearing on August 10, 2005, Lita testified that he fears for his life in Albania, because of his former difficulties with members of the State Intelligence Service. He testified about four separate, politically-motivated severe beatings, the first

4

of which occurred near the Institute area in Tirana on December 11, 1997, when he was taken to a basement and beaten up by the secret police. The second occurred on September 13, 1999 after his family's store was destroyed and he was held in detention for twelve hours. The third occurred in 2001, and the fourth occurred in October 2003 after the local elections for mayor of the community in Kala. The Socialists lost the election and closed down the polls where Lita worked. Lita was stopped in Peshkopi and the communists beat him up. It was the beating in October 2003 which worried his wife enough that she begged him to flee Albania.[2] Since his departure Lita has been advised by his wife and father that agents of the government have come looking for him.

On cross-examination, the government established that Lita's wife lives in Albania with his parents, and that he is in frequent communication with her. His family is aware of what happened to him on those occasions when he was beaten by members of the secret police. In addition, Lita clarified that the 1997 incident about which he had testified actually occurred on September 11, and not December 11, and that the 2001 incident when he was beaten up and threatened by the secret police occurred in the month of October. Lita also admitted that his uncle, who was granted asylum in 1969 and now lives in the United States, visited Albania in 2003 without incident. The government also sought and received various explanations from Lita about omissions and inconsistencies in his claim for relief.

---

[2] Lita was married on June 18, 2003.

In addition, the Administrative Record contains the State Department's Country Report on Human Rights Practices for Albania for 2004. It states that municipal elections took place in 2003, and they met basic democratic standards. The Democratic and Socialist parties held the majority of seats in the Parliament. The record also contains a State Department Profile of Asylum Claims and Country Conditions for Albania, which states that 1997 was the most chaotic year in Albanian history, but there have been no major outbreaks of political violence since 1998, and neither the Albanian government nor the major political parties engage in policies of abuse against their political opponents. There were, however, small-scale clashes between individual competing party supporters during the period from 2000-2003.

The Immigration Judge denied relief, rendering an Oral Decision. Although he believed that Lita had credibly established that he was a member of the Democratic Party, he concluded that Lita was not credible on the persecution question on the basis of omissions and inconsistencies in his case for relief, and the lack of documentation. The problems noted by the IJ were as follows. The September 1997 beating, an important one because it was the first, was not mentioned in the original asylum application. The general political climate in Albania in 1997 was discussed, but there was no mention of Lita's having been beaten. His explanation that his cousin helped him with the original application did not excuse the omission. Even more damaging, the September 1997 beating was not mentioned in the second asylum application, which was prepared with the

assistance of counsel.

The IJ next noted that the September 1999 beating and the twelve-hour detention, which occurred after the family store was destroyed, was not mentioned in the original asylum application. Lita's explanation for this omission – that he discussed this event in his interview at the asylum office – fell short because the assessment memorandum from that February 10, 2005 interview, A.R. 175-76, does not make reference to this specific incident. The October 2001 incident was not mentioned in either of the asylum applications. Finally, and most damaging of all, the October 2003 incident which so alarmed his wife that she advised him to leave Albania, was not mentioned in either the original *or* second asylum applications.

The IJ went on to note that the September 1998 incident at Azem Hajdari's funeral, which was discussed in the original asylum application, was omitted from the second application, and the April 2002 incident, which was discussed in the original application, was omitted from the second application and Lita's sworn testimony. Furthermore, Lita's documentation did little to bolster his credibility. His statement from the Democratic Party Chairman, Tirana Branch, attesting to his membership in the party, stated only generally that he had been "persecuted, harassed, arrested and beaten by the Secret Police for his loyalty to the Democratic Party," A.R. 221, and those with first-hand knowledge of what had happened to him, his father and especially his wife, had not submitted supportive affidavits. Lita admitted that he spoke with both his father and his

wife on a regular basis. The IJ also concluded that Lita did not meet his burden of establishing a well-founded fear of future persecution on the basis of his membership in the Democratic Party, noting that his uncle, also an avowed anti-Communist, was able to visit Albania in 2003 without incident. In addition, he had no evidence to show that he would be tortured by the Albanian government if returned to Albania. The voluntary departure application was granted.

Lita appealed, contending that he should be given the benefit of the doubt on the credibility question because the inconsistencies in his case for relief were minor. On February 22, 2007, the Board of Immigration Appeals dismissed the appeal, concluding that there was no clear error in the IJ's credibility determination, 8 C.F.R. § 1003.1(d)(3)(i). The Board reasoned that the IJ properly rested his determination on material inconsistencies between Lita's testimony, his original asylum application and his second application, and gave these examples of inconsistencies relating to significant events central to Lita's case. First, Lita testified that on September 11, 1997 he was taken to a basement, beaten, and warned not to continue working for the Democratic Party, but he only mentioned that he had been threatened in 1997 because of his political activities in his original and second asylum applications. There was no mention of a beating. Second, he testified to, and mentioned in his second asylum application, that he was beaten and his store was destroyed in September 1999, but he made no mention of this in his original asylum application. Third, he testified that he decided to leave Albania after

he was badly beaten in October 2003, but he made no mention of this incident in his original or second asylum applications. Lita's explanations for these omissions and inconsistencies were unconvincing. The Board also found no clear error in the IJ's finding concerning corroborating evidence. The IJ's determination that Lita did not establish that it is more likely than not that he would be tortured in Albania also was upheld. Lita timely petitioned for review.

We will deny the petition. We have jurisdiction to review final orders of removal pursuant to 8 U.S.C. § 1252(a)(1). Where the Board renders an opinion that sets forth grounds of decision independent of those relied on by the IJ, we review only the Board's decision and not that of the IJ, see Xie v. Ashcroft, 359 F.3d 239, 240 (3d Cir. 2004), but where, as here, the Board adopted the IJ's reasoning explicitly or implicitly in disposing of the contentions on appeal, we review the IJ's opinion as well, id. at 242. The Board's factual determinations are upheld if they are supported by reasonable, substantial, and probative evidence on the record considered as a whole. Immigration & Naturalization Serv. v. Elias-Zacarias, 502 U.S. 478, 481 (1992).

We review an adverse credibility determination under the substantial evidence standard. Xie, 359 F.3d at 242. Under this deferential standard of review, we must uphold the credibility determination unless "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). We thus are required to sustain an adverse credibility determination "unless no reasonable person would have

found the applicant incredible." Chen v. Ashcroft, 376 F.3d 215, 222 (3d Cir. 2004) (internal quotations and citation omitted). This standard of review is even more deferential than the "clearly erroneous" standard. See Reynoso-Lopez v. Ashcroft, 369 F.3d 275, 278 (3d Cir. 2004). "Generally, minor inconsistencies and minor omissions that reveal nothing about an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding," Berishaj v. Ashcroft, 378 F.3d 314, 323 (3d Cir. 2004) (internal quotations and citations omitted), but we uphold adverse credibility determinations based on omissions and discrepancies that go to the heart of a petitioner's claim. Chen, 376 F.3d at 224.[3]

An applicant for asylum bears the burden of establishing that he is unable or unwilling to return to his home country "because of [past] persecution or a well-founded fear of future persecution on account of race, religion, nationality, membership in a particular social group, or political opinion[.]" 8 U.S.C. § 1101(a)(42)(A); see 8 C.F.R. § 1208.13(a); Abdille v. Ashcroft, 242 F.3d 477, 482 (3d Cir. 2001). To establish eligibility on the basis of past persecution, an alien must make a credible showing that he suffered some harm rising to the level of persecution on account of a statutorily protected ground, and that it was committed by the government or forces the government is

---

[3] Under the REAL ID Act of 2005, credibility determinations may be made "without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim." Pub. L. No. 109-13, § 101(a)(3)(B)(iii), 119 Stat. 231, 303 (2005). However, this provision of the REAL ID Act applies only to cases where the applicant applied for asylum or other relief after May 11, 2005. See id. § 101(h)(2), 119 Stat. at 305. Because Lita applied for asylum in 2004, our pre-REAL ID Act standard applies.

unwilling to control. <u>Gao v. Ashcroft</u>, 299 F.3d 266, 272 (3d Cir. 2002).

Lita has argued in his brief on appeal that there were no inconsistencies when his two asylum applications and testimony at the removal hearing are read as a whole, <u>Elias-Zacarias</u>, 502 U.S. at 481. With respect to the September 11, 1997 beating, although the original asylum application did not mention that specific date, it does in fact refer to an arrest and detention, and a beating that lasted for a period of three days, App. 232-33. He contends that the mere omission of the specific date of one incident is insufficient to uphold a credibility determination, because the Board did not adequately explain the significance of the discrepancy, and its subjective view of what a persecuted person would include in his asylum application has no place in an adverse credibility determination, <u>Bandari v. Immigration & Naturalization Serv.</u>, 227 F.3d 1160 (9th Cir. 2000) (inconsistency between statement on application that alien was sentenced to 75 lashes for interfaith dating and his testimony that he was whipped 75 times on day police caught him with woman of another faith was not permissible basis for adverse credibility finding). In addition, the original asylum application provides specific dates of other beatings (on September 12, 1998, May 1, 1999, August 10, 1999, September 13, 1999, September 2001, and April 2002). Furthermore, although he testified to and mentioned in his second asylum application that he was beaten and his store was destroyed in 1999, but he did not mention this incident in his original asylum application, the second Form I-589

application is specifically on its face denominated as "SUPPLEMENTAL," App. 179,[4] and the purpose of a supplement is to *add* information to the original application. The second application was not intended to take the place of the original asylum application. Since his removal hearing testimony was consistent with his second asylum application with respect to the September 1999 incident involving the destruction of his store and the twelve-hour detention and beating, this omission or inconsistency noted by the Board also does not truly bear on his credibility. Finally, Lita contends that his failure to mention the October 2003 beating in either the original or second asylum applications can be excused, because it is sufficient that he reported this incident at his asylum interview in Lyndhurst, N.J., an interview that was memorialized in Exhibit 12 ("Assessment To Refer, etc."), App. 175.

We have carefully considered these contentions in our review of both asylum applications and Lita's testimony, and all of the other items in the record, but conclude that, because the IJ and Board gave specific, cogent reasons for disbelieving Lita, we must uphold the adverse credibility determination. 8 U.S.C. § 1252(b)(4)(B). See also Reynoso-Lopez, 369 F.3d at 278. Here, there were true and *numerous* inconsistencies in Lita's case for relief. His statements and testimony as set out above contain inconsistencies and omissions, which, taken together, call his credibility into question.

---

[4] We note that the counseled second application bears a "SUPPLEMENTAL" notation on the first page, A.R. 179. The word appears in a box on the form labeled "**FOR EOIR** [Executive Office For Immigration Review] **USE ONLY**."

Taken in isolation, each inconsistency noted by the Board might be considered minor. There is, for example, mention of a beating in the original asylum application even though the date was not specified. But they are still inconsistencies in evidence or admissions involving the "heart of the asylum claim," Gao, 299 F.3d at 272, and the omission of any reference whatever to the October 2003 incident from either the original or counseled second applications truly bears on Lita's credibility for the reasons given by the Board and the Immigration Judge.[5]

Furthermore, the Board discussed the three incidents of September 11, 1997, September 1999, and October 2003 as *examples* of omissions and inconsistencies. The IJ noted other omissions and inconsistencies which the Board impliedly relied upon, including the September 1998 beating that occurred in conjunction with Lita's attendance at Azam Hajdari's funeral, and the April 2002 beating when he was left lying in the street. The October 2001 beating incident mentioned by Lita at his removal hearing is not mentioned in the original or counseled second applications (although the original application mentions a September 2001 incident). When asked to explain, Lita gave weak and unconvincing reasons for the omissions and inconsistencies.

Based on the record, the conclusions of the Board and IJ were supported by

---

[5] We further note that, in his original asylum application, Lita referred to a beating in April 2002 as the event that triggered his decision to leave Albania, A.R. 233, and, in his counseled second application, he referred to the September 1999 incident involving his family's store and his twelve-hour detention and beating as the event that triggered his decision to leave Albania, A.R. 191.

substantial evidence and must be upheld. Because Lita did not establish a credible case that he was persecuted in the past, he does not enjoy a presumption of a well-founded fear of future persecution, Lukwago v. Ashcroft, 329 F.3d 157, 174 (3d Cir. 2003), and he did not establish a well-founded fear of future persecution by demonstrating a subjective fear of persecution, and that a reasonable person in his circumstances would fear persecution if returned to the country in question, Zubeda v. Ashcroft, 333 F.3d 463, 469 (3d Cir. 2003). The 2004 Country Report establishes the rise of the Democratic Party within Albania and does not cite instances of Democratic Party members being singled out for persecution, and Lita's uncle, a victim of past persecution, safely visited Albania in 2003.

Because Lita failed to show past persecution or a reasonable fear of future persecution under the lower burden of proof required for asylum, he is necessarily ineligible for withholding of removal. See Immigration & Naturalization Serv. v. Cardoza-Fonseca, 480 U.S. 421, 430-32 (1987). Furthermore, the Board held that Lita did not meet his burden of establishing that it is more likely than not that he will be tortured upon his return to Albania, 8 C.F.R. §§ 208.16, 208.18, and we conclude that the record does not compel a different conclusion. This is not a case in which the Board and the IJ failed to analyze a CAT claim as distinct from claims under the INA and allowed an adverse credibility determination to bleed into what should be an entirely objective analysis under the CAT. See Zubeda, 333 F.3d at 476.

For the foregoing reasons, we will deny the petition for review.

14